Agnès TROUBLÉ, Plaintiff

v.

THE WET SEAL, INC., Defendant.

No. 99 CV. 10997(VM).

United States District Court,
S.D. New York.

Dec. 14, 2001.

Gloria C. Phares, Noah H. Charlson, Deborah K. Steinberger, Patterson, Belknap, Webb & Tyler L.L.P., New York City, for Plaintiff.

David M. Zensky, Akin, Gump, Strauss, Hauer & Feld, L.L.P., New York City, for Defendant.

## DECISION AND ORDER

MARRERO, District Judge.

Plaintiff Agnès Troublé (hereinafter "Troublé"), brought this action against Defendant, The Wet Seal, Inc. (hereinafter "Wet Seal"), alleging that Wet Seal: (1) infringed upon her trademark rights, in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1); (2) diluted her trademark in violation of New York General Business Law § 368–d; and (3) engaged in unfair competition in violation of common law. Fact discovery concluded on December 15, 2000 and expert discovery concluded on March 15, 2001. Now before the Court are several motions *in limine,* four filed by Troublé and one omnibus motion filed by Wet Seal. For the reasons stated below, both Troublé's and Wet

Seal's motions are granted in part and denied in part.

## I. FACTUAL BACKGROUND

Troublé is a French citizen and fashion designer who sells a variety of ready-to-wear clothing, perfume and cosmetics under the registered trademark "Agnès b.". Defendant Wet Seal is Delaware corporation, with its principal place of business in El Toro, California. Since 1997, Wet Seal has marketed and sold a line of clothing and accessories for young women under the name and mark "Arden B.".

On November 2, 1999, Troublé filed this action alleging that Wet Seal's use of the "Arden B." mark infringed upon Troublé's trademark rights in violation of federal and state law. Subsequently, Troublé filed a First Amended Complaint and later a Second Amended Complaint (hereinafter "Compl."). The three versions of the complaint contain similar allegations: that Wet Seal's mark was confusingly similar to Troublé's "Agnès b." trademark, that customers were confused, and that Troublé was economically injured as a result. Through the course of discovery, the parties exchanged documents, served and answered interrogatories, and took depositions. In addition, both parties retained a number of experts, some of whom produced reports for use in this case. Sometime in mid–1999, the Chief Operating Officer of Troublé's stores in this country instructed employees to record, in writing, instances when a customer appeared confused between Troublé's trademark and Wet Seal's mark. In the instant set of motions, Wet Seal contests the admissibility of these written recordings (hereinafter the "confusion logs").

Upon completion of discovery and in preparation for trial, Troublé and Wet Seal filed a proposed joint pretrial order, as well as a number of motions *in limine,* contesting, *inter alia,* the admissibility of documents and deposition testimony obtained in discovery and the scope of legal theories and claims which may be properly asserted in the case.

## II. DISCUSSION

### A. WET SEAL'S MOTION TO BAR TROUBLÉ FROM ASSERTING A "REVERSE CONFUSION CLAIM"

Under § 1114 of the Lanham Act, a plaintiff in a trademark infringement action must show that defendant (1) without consent, (2) used in commerce, (3) a reproduction, copy or colorable imitation of plaintiff's registered mark, as part of the sale or distribution of goods or services, and (4) that such a use is likely to cause confusion to customers. *See Gruner + Jahr USA Publishing, et al. v. Meredith Corp.,* 991 F.2d 1072, 1075 (2d Cir.1993) (citing 15 U.S.C. § 1114(1)(a)). The central issue in many trademark infringement cases is whether a similarity of marks creates a likelihood of confusion to customers. *See Lang v. Retirement Living Publishing Co., Inc.,* 949 F.2d 576, 579 (2d Cir.1991). To establish a likelihood of confusion, a plaintiff must establish that "numerous ordinary prudent purchasers are likely to be misled or confused as to the source of the product in question because of the entrance in the marketplace of defendant's mark." *Gruner,* 991 F.2d at 1077 (citing *Western Pub. Co. v. Rose Art Industries, Inc.,* 910 F.2d 57, 59 (2d Cir. 1990)). Subsumed under the likelihood of confusion analysis are two types of potential confusion that may support a claim of infringement: forward confusion and reverse confusion. *See Banff, Ltd. v. Federated Department Stores, Inc.,* 841 F.2d 486, 490 (2d Cir.1988). Forward confusion is the misimpression that the senior user, in this case Troublé, is the source of the junior user's goods, in this case Wet Seal's

ready-to-wear clothing. *See id.* (citing 2 T. McCarthy, *Trademarks and Unfair Competition* § 23:1(E) (2d ed.1984)). Reverse confusion is the misimpression that the junior user is the source of the senior user's goods. *See id.*

In this case, Wet Seal contends that Troublé has improperly altered the underpinning legal theory of her case after the close of discovery. It asserts that in the three versions of her complaint and through the course of discovery, Troublé consistently framed her allegations as a forward confusion trademark infringement claim. Wet Seal maintains that at the close of expert discovery, Troublé suddenly indicated that she would also pursue her claims on a theory of reverse confusion.

Generally, a complaint that gives "full notice" of the circumstances giving rise to the plaintiff's claim for relief "need not also correctly plead the legal theory or theories and statutory basis supporting the claim." *Simonton v. Runyon*, 232 F.3d 33, 36 (2d Cir.2000) (quoting *Marbury Management, Inc. v. Kohn*, 629 F.2d 705, 712 n. 4 (2d Cir.1980)). However, it is inappropriate for a plaintiff to assert entirely new claims after the close of discovery, since this would "inevitably prejudice the defendant." *Beckman v. United States Postal Service*, 79 F.Supp.2d 394, 407 (S.D.N.Y. 2000).

Here, the Court finds that Troublé has given Wet Seal full notice of her trademark infringement claim. As the court in *Banff* noted, allegations of forward confusion and reverse confusion do not form distinct claims—they are alternative theories that can be used separately or together in a trademark infringement claim under the Lanham Act. *See Banff*, 841 F.2d at 490–91. In addition, although the complaint alleges forward confusion—that Wet Seal designed its mark with intention of "benefitting from the valuable reputation and goodwill" of Troublé's trademark (Compl.¶ 21), it also alleges that customers were confused about the affiliation between Troublé's stores and Wet Seal's clothing (Compl.¶ 19). As a result, Troublé's complaint can be read to encompass both theories. Accordingly, Wet Seal's motion *in limine* to bar Troublé from asserting instances of reverse confusion is denied.

## B. *WET SEAL'S MOTION TO BAR TROUBLÉ FROM ASSERTING A CLAIM FOR MONETARY DAMAGES*

■ Wet Seal contends that Troublé failed to provide discovery related to her claim for monetary damages in a timely manner, thus preventing Wet Seal from testing Troublé's theories of damages and remedies. As a result, Wet Seal argues, the Court should prohibit her from asserting any claim for monetary damages. In response, Troublé makes three arguments: (1) she and employees from her company provided numerous documents and testimony related to her sales in the United States and her profit margin, (2) Wet Seal was not prejudiced by alleged failures to provide discovery, and (3) Wet Seal has not shown that a continuance would unduly delay trial. There is no dispute that Troublé failed to respond to one damages-related interrogatory and produced several documents after the deadline for discovery had elapsed.

This Court has wide discretion to sanction a party for failing to conform to the rules of discovery. *See Outley v. City of New York*, 837 F.2d 587, 590 (2d Cir.1988) (citing *National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 643, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976) (per curiam)). However, the Second Circuit has enumerated several factors that a district court should consider before ex-

cluding evidence that is obtained after the scheduled end of discovery: (1) the party's explanation for the failure to comply with the discovery order; (2) the importance of the evidence; (3) the prejudice suffered by the opposing party as a result of having to respond to the new evidence; and (4) the possibility of a continuance. *See Softel, Inc. v. Dragon Medical and Scientific Communications, Inc.,* 118 F.3d 955, 961 (2d Cir.1997) (citing *Outley,* 837 F.2d at 590–91).

Considering the first factor, Troublé has not provided a sufficient explanation for her tardy production of documents and her failure to respond to Wet Seal's interrogatory. On May 17, 2000, in response to Wet Seal's requests for documents and information related to Troublé's claim for monetary damages, Troublé objected that the requests "prematurely seek information that may be provided by expert witnesses" and represented that she would "supplement this response at a later date." (Plaintiff's Response to Defendant's First Set of Interrogatories, dated May 17, 2000, at 11–12; Plaintiff's Response to Defendant's First Request for Production of Documents, dated May 17, 2000, at 13–14.)

Almost one year later, after the close of expert discovery, Troublé's expert, Marvin Traub (hereinafter "Traub"), produced a supplemental report (hereinafter "Traub Supp. Report") with two supporting documents. The report and supporting documents contain detailed information related to Troublé's claim for monetary damages.[1] In her motion papers, Troublé does not provide any excuse or justification for the late production of these and other documents. With regards to her failure to respond to the interrogatory, she claims that it was a "simple oversight." (Plaintiff's Memorandum of Law in Opposition to Defendant's Omnibus Motion *In Limine,* dated July 20, 2001 (hereinafter "Pl.'s Mem. in Opp.") at 35.)

Under the Federal Rules of Civil Procedure, parties must answer interrogatories and produce requested documents in a timely fashion. In addition, if a party learns that a particular response is incomplete, she has an obligation to "seasonably amend" the response. *See* Fed.R.Civ.P. 26(e)(2). Parties are not permitted to ignore or overlook their discovery obligations. Accordingly, the Court finds that the first *Softel* factor weighs heavily against Troublé.

The second *Softel* factor, the importance of the evidence in question, weighs in favor of Troublé. In her Complaint, Troublé alleges that there have been instances of actual customer confusion (Compl.¶ 19) and that as a result, she suffered economic harm (Compl.¶ 27). A number of documents, such as the two documents attached to Traub's supplemental report, potentially support her claim for monetary damages.[2] Even assuming that injunctive relief is the "generally applied remedy" in trademark infringement cases, as Wet Seal contends, evidence that potentially supports a claim for damages is clearly important.

---

1. The Court also notes that Troublé responded to other Wet Seal requests long after the close of discovery. For example, on Oct. 30, 2000, Wet Seal requested documents related to Troublé's licensing agreements with suppliers of cosmetics and accessories. In response, Troublé produced over one hundred pages of documents on July 19, 2001, approximately four months after the end of expert discovery and one month after the initial filing of these motions. Troublé has provided no explanation for the timing of her production of these documents.

2. This finding has no effect on the admissibility of Traub's supplemental report, discussed *infra* section II.D at pp. 20–23.

The third *Softel* factor—the prejudice suffered by the opposing party as a result of having to respond to the new evidence—weighs minimally in favor of Wet Seal. While Troublé's complaint did put Wet Seal on general notice that she would claim monetary damages, the details of this claim were not revealed until after discovery had ended. This unexplained delay prevented Wet Seal from responding to Troublé's evidence in the normal course of discovery. For example, Wet Seal's expert, Mary Woodford (hereinafter "Woodford"), was unable to fully consider Troublé's evidence of damages when writing her report.[3]

The fourth and final *Softel* factor—the possibility of a continuance—weighs in favor of Troublé. Although discovery is over, no trial date has been set. In addition, the Court has broad discretion over the scheduling of discovery and trials. *See Softel*, 118 F.3d at 962–63. The reopening of discovery here will certainly increase delay and costs, but the Court finds that this is more appropriate than barring Troublé from asserting an important aspect of her case.

Accordingly, the Court will not exclude Troublé's evidence of damages on the basis that she failed to produce evidence in a timely manner. However, the Court grants Wet Seal thirty days from the date of this Decision and Order to conduct additional discovery related to evidence produced by Troublé after March 15, 2001. In addition, Troublé is directed to respond, within seven days from the date of this Order, to any unanswered interrogatories and document requests. If she fails to do so, the Court will consider a request for sanctions under Rule 37(c)(1) of the Federal Rules of Civil Procedure.

## C. WET SEAL'S MOTION TO EXCLUDE TROUBLÉ'S CONFUSION LOGS

Wet Seal asserts that Troublé's confusion logs constitute inadmissible hearsay under Federal Rule of Evidence 802. It contends that the confusion logs contain double hearsay because they are employee recordings of statements made by anonymous customers that are being offered for the truth of the matter asserted. Troublé responds that both statements fall within hearsay exceptions: (1) the customers' statements will be offered to show their state of mind and are admissible under Federal Rule of Evidence 803(3); and (2) the employees' recordings of those statements were either business records or should be admitted under Federal Rule of Evidence 807, the residual exception to the hearsay rule. For the reasons discussed below, the Court concludes that the anonymous statements of the customers are admissible but the recordings of those statements are not. As a result, the confusion logs are inadmissible.

### 1. The Statements by Troublé's Customers

■ Hearsay is defined as an out-of-court statement being offered for the truth of the matter asserted. *See* Fed.R.Evid. 801. Here, Troublé seeks to introduce customer statements to show the customers' state of mind—that they were con-

---

**3.** The report states: "On the basis of materials provided in discovery..., I find no evidence that could support ... elements of damages in this case. For example, although Agnès Troublé engages in licensing of its trademarks, it has declined to produce any such licenses, or its revenues earned from such licenses, that might indicate whether there has been a diminution in the value of the trademark, or what a reasonable royalty might be." (Expert Report of Mary Woodford, dated March 15, 2001 at 5 (hereinafter "Woodford's Report").)

fused—as opposed to the truth of what they said. *Cf. Fun–Damental Too, Ltd. v. Gemmy Industries Corp.*, 111 F.3d 993, 1003–04 (2d Cir.1997) (finding that out-of-court statements offered to establish customer confusion is not hearsay). In addition, Federal Rule of Evidence 803(3) allows statements, otherwise excluded as hearsay, to be admitted to show a declarant's then existing state-of-mind. *See id.* (citing *Armco, Inc. v. Armco Burglar Alarm Co., Inc.*, 693 F.2d 1155, 1160 n. 10 (5th Cir.1982)).[4] Accordingly, there is no hearsay problem with the statements by Trouble's customers indicating that they were confused. *See id.*

### 2. *Recordings of Customer Statements in the Confusion Logs*

■ The admissibility of the recordings themselves presents a more difficult question. Recognizing this issue, Trouble proposes two alternative theories to support her argument that the recordings are admissible: (1) they constitute business records under Federal Rule of Evidence 803(6); or (2) they should be admissible under the residual hearsay exception in Federal Rule of Evidence 807. Finally, she asserts that if the Courts finds them to be inadmissible, she may still use them to refresh her witnesses' recollections at trial. The Court finds that the logs are inadmissible under both of Trouble's theories.

Under Federal Rule of Evidence 803(6), the following are not excluded by the hearsay rule:

> A memorandum, report, [or] record ... of acts, events, conditions, opinions, or diagnoses, made ... from information transmitted by, a person with knowledge, if *kept in the course of a regularly conducted business activity,* and if it was the *regular practice of that business activity* to make the memorandum, report, [or] record ..., *all as shown by the testimony of the custodian* ..., unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

(emphasis added). Trouble's attempted reliance on Federal Rule of Evidence 803(6) has numerous problems. The confusion logs were not created and kept in the ordinary course of business; rather, they were prepared due to instructions from Trouble's management (Pl.'s Mem. in Opp. at 6), most likely to serve the purposes of this litigation.[5] Furthermore, Trouble has not elicited any custodian testimony to establish a foundation for the

4. The Court is not persuaded by Wet Seal's argument that the statements are too "vague and ambiguous" to be admitted under Federal Rule of Evidence 803(3). The principal case that Wet Seal relies on, *Resource Developers, Inc. v. Statue of Liberty–Ellis Island Foundation*, No. 87 Civ.1993, 1990 WL 67431 (S.D.N.Y. May 16, 1990), involved the admissibility of affidavits that generally asserted that customers and retail stores were confused about the source of flags made by both parties. In contrast, the confusion logs at issue here contain specific statements by individual customers. A review of the confusion logs indicates that some customers thought that they could buy Wet Seal products in Trouble's stores.

5. It is implausible that Trouble's "regular course of business" included making confu-

sion logs. A business record is not evidence, under Federal Rule of Evidence 803(6), if it was drafted in response to unusual or isolated events. *See Phoenix Associates III v. Stone*, 60 F.3d 95, 101 (2d Cir.1995) (citing *United States v. Strother*, 49 F.3d 869, 876 (2d Cir. 1995)). In addition, "data prepared or compiled for use in litigation are not admissible as business records." *Potamkin Cadillac Corp. v. B.R.I. Coverage Corp.*, 38 F.3d 627, 632 (2d Cir.1994) (citing *Palmer v. Hoffman*, 318 U.S. 109, 114, 63 S.Ct. 477, 87 L.Ed. 645 (1943)). Here, Trouble's management instructed its employees to create the confusion logs in mid–1999, around the time that Trouble commenced this action. In her papers, Trouble states that "the logs were concededly created in order to preserve a record of customer confusion for trial ...." (Pl.'s Mem. in Opp. at 26 n. 19.) As a qualification to this

confusion logs as business records. *See* Fed.R.Evid. 803(6).

■ In addition, the Court finds that the confusion logs do not have "sufficient indicia of trustworthiness to be considered reliable." *United States v. Freidin,* 849 F.2d 716, 721 (2d Cir.1988). Many of the log entries are incomplete, disjointed and fail to fully identify who made or recorded the statements. It is also unclear whether Troublé's employees recorded actual conversations they had with customers or conversations they overheard customers have with others. *See, e.g.,* Lash Dep. at 32–33 (testifying that some of the log entries recorded actual conversations and other entries recorded overheard conversations). Accordingly, the Court finds that the confusion logs do not fall within the business records or the residual exceptions to the hearsay rule [6] and are inadmissible.

■ Finally, Troublé maintains that if the Court finds that the confusion logs are hearsay and do not fall within exceptions under Federal Rule of Evidence 803(6) or Federal Rule of Evidence 807, the authors of the log entries should be permitted to read them into the record at trial pursuant to Federal Rule of Evidence 803(5).[7] Although this exception may be applicable at trial, Troublé will first have to establish that: (1) the employee had firsthand knowledge of the statement made by a customer; (2) the employee made the confusion log entry at or near the time she heard the customer make the statement; (3) the employee made the recording accurately; and (4) the employee can no longer fully recollect the substance of the customer's statement. *See* Fed.R.Evid. 803(5); *see also* 2 McCormick et al., *Evidence* § 279 at 240–45 (5th ed.1999). If admitted, individual log entries may be read into the record but they will not be received as an exhibit unless offered by Wet Seal. Pursuant to the request in her motion papers, Troublé is granted leave to amend her witness list to add current "Agnès b." store employees who authored specific entries in the confusion logs.

### D. *WET SEAL'S MOTION TO EXCLUDE MARVIN TRAUB'S TESTIMONY*

Wet Seal asserts that the testimony of Troublé's expert, Marvin Traub, is unrelia-

---

concession, she maintains that the logs were made for normal business purposes, in addition to litigation purposes. Troublé cites testimony from a single deposition to support this assertion. (Pl.'s Mem. in Opp. at 26 (citing Dep. of Jennifer Lash, dated Dec. 4, 2000, at 32–33).) However, a review of the Lash Deposition reveals only that Troublé's management instructed employees to create the confusion logs, not that they were created for a normal business purpose. *See* Lash Dep. at 32–33. The creation of the logs was not a regular business practice simply because it was customary for Troublé's employees to follow instructions from management.

6. Since the confusion logs lack indicia of trustworthiness, they cannot benefit from the residual hearsay exception under Federal Rule of Evidence 807. *See United States v. Bryce,* 208 F.3d 346, 350 (2d Cir.1999) (stating that hearsay evidence is admissible under Federal Rule of Evidence 807 if: "(i) it is particularly trustworthy; (ii) it bears on a material fact; (iii) it is the most probative evidence addressing that fact; (iv) its admission is consistent with the rules of evidence and advances the interests of justice; and (v) its proffer follows adequate notice to the adverse party").

7. Under Federal Rule of Evidence 803(5), the following is not excluded by the hearsay rule: "A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in the witness' memory and to reflect that knowledge correctly. If admitted, the memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party."

ble and should be excluded under Federal Rule of Evidence 702 and the principles contained in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

Under *Daubert*, a district court is required to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. at 589, 113 S.Ct. 2786. The Supreme Court's decision in *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), makes clear that this "gate-keeping function applies not just to scientific expert testimony as discussed in *Daubert*, but also to testimony based on technical and other specialized knowledge ...." *MTX Communications Corp. v. LDDS/WorldCom, Inc.*, 132 F.Supp.2d 289, 290–91 (S.D.N.Y.2001) (citing *Brooks v. Outboard Marine Corp.*, 234 F.3d 89, 91 (2d Cir.2000)). Trial courts have broad discretion to admit or exclude expert testimony, provided such decisions are not "manifestly erroneous." *United States v. Aminy*, 15 F.3d 258, 261 (2d Cir.1994).

In assessing the reliability of a proffered expert's testimony, a district court's inquiry under *Daubert* must focus, not on the substance of the expert's conclusions, but on whether those conclusions were generated by a reliable methodology. *See Daubert*, 509 U.S. at 590, 595, 113 S.Ct. 2786; *see also Amorgianos v. National Railroad Passenger Corp.*, 137 F.Supp.2d 147, 162 (E.D.N.Y.2001). In *Daubert*, the Supreme Court set out a list of non-exclusive factors that a trial court may consider in determining whether an expert's reasoning or methodology is reliable: (1) whether the theory or technique on which the expert relies has been tested—that is, whether the expert's technique can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability; (2) whether the theory or technique has been subject to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the theory or method has been generally accepted by the expert community. *See Daubert*, 509 U.S. at 593–94, 113 S.Ct. 2786.

The test of reliability, however, is a "flexible" one, and the factors set forth in *Daubert* do not constitute a "definitive checklist or test." *See Kumho Tire*, 526 U.S. at 150, 119 S.Ct. 1167 (quoting *Daubert*, 509 U.S. at 593, 113 S.Ct. 2786). Whether the *Daubert* factors are pertinent to assessing reliability in a particular case depends on "the nature of the issue, the expert's particular expertise, and the subject of his testimony," and "a trial court should consider the specific factors identified in *Daubert* where they are reasonable measures of the reliability of expert testimony." *Kumho Tire*, 526 U.S. at 150, 119 S.Ct. 1167. In short, "the gatekeeping inquiry must be 'tied to the facts' of a particular case," *Id.* (quoting *Daubert*, 509 U.S. at 591, 113 S.Ct. 2786), and "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Id.* at 152, 119 S.Ct. 1167.[8] No single factor is necessarily

---

**8.** In addition, trial courts have broad discretion to determine whether further proceedings are necessary before excluding expert testimony under *Daubert*. In *Kumho*, the Supreme Court pointed out that:

The trial court must have the same kind of latitude in deciding *how* to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability, as it enjoys

dispositive of the reliability of a particular expert's testimony and a "review of the case law after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule." Advisory Committee Notes, 2000 Amendments, Fed. R.Evid. 702.

As gate-keeper, the Court must first determine whether Traub's proffered testimony rests on a reliable foundation—that is, whether his testimony is "more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590, 113 S.Ct. 2786. Expert testimony should be excluded "if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith ...." *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir.1996) (internal marks omitted). Although this Court must focus on Traub's principles and methodology and not on his conclusions, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *General Electric Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). The second gate-keeping function of the Court is to determine whether Traub's proffered testimony is relevant and will "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702. It must not only have a reliable foundation but also be relevant in that it "fits" the facts of this

case. *Daubert*, 509 U.S. at 591–592, 113 S.Ct. 2786.

Traub submitted his expert report on March 15, 2001 (hereinafter the "Traub Report") and his supplemental report on April 4, 2001, commenting on consumer confusion created with the launch of Wet Seal's mark, loss of business due to the confusion, and resulting damages to Troublé's business opportunities. In the first report, Traub stated that, in forming his opinions, he relied on numerous pieces of evidence, such as deposition transcripts, annual reports, marketing plans, and financial information. Traub also visited the stores of Wet Seal and Troublé and reviewed the confusion logs created by Troublé's employees. Wet Seal contests three of Traub's opinions; in particular, it objects to Traub's opinion on (1) customer confusion, (2) Troublé's expansion strategy, and (3) damages.

*1. Traub's Opinion on Customer Confusion*

■ In his March 15, 2001 report Traub wrote that, "[i]t is very evident that there is a vast amount of confusion between [the] brands [of Troublé and Wet Seal]." Traub Report at 12. To reach this conclusion, Traub visited several of the parties' stores, looked at their products, and reviewed Troublé's confusion logs. The Court finds that this conclusion will be of little value to a finder of fact. Reviewing the "Background and Qualifications" section of his report, it appears that Traub has neither experience assessing the likelihood of confusion between names and marks nor other experience that would qualify him as an

when it decides *whether or not* that expert's relevant testimony is reliable.

526 U.S. at 152 (emphasis in original). Although it is common for a trial court to hold a hearing before excluding expert testimony, such a hearing is not necessary if "the parties have provided a sufficient basis for [a] deci-

sion." *Bank Brussels Lambert, et al. v. Credit Lyonnais (Suisse) S.A., et al.*, No. 93 Civ. 6876, 2000 WL 1694321, *1 (S.D.N.Y. Nov. 13, 2000) (quoting 4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 702.02[2] at 702–7 to 702–8 (2d ed.2000)).

expert on this issue. Without such experience, his opinion on confusion is merely conjectural.

Furthermore, it is hard to determine what methodology, if any, Traub used to reach his conclusion.[9] Comparing products and store appearances is something the average trier of fact can perform without the assistance of a former retailing executive. Similarly, a trier of fact can assess customer statements evidencing confusion, assuming they are admissible at trial.

### 2. *Traub's Opinion on Troublé's Expansion Strategy*

■ In his supplemental report, Traub wrote, "[f]rom documents provided by [Troublé's management] and my review of the record, ... it is clear that 'Agnès b.' plans a much more aggressive expansion policy that is partially mall-based." Traub Supp. Report at 2. Traub attached to his report two documents related to Troublé's planned expansion into shopping malls and associated start-up costs. Wet Seal contends that Traub's statement and the use of these documents was an improper attempt to provide fact testimony through an expert. However, there is nothing to prevent a party's expert from making an assumption to conduct an analysis, subject to the aforementioned limitations contained in *Daubert* and subsequent case law. *See* Fed.R.Evid. 703. Traub's opinion on Troublé's expansion strategy, based on his former experience as an executive of a major chain of retail clothing stores, is sufficiently reliable and relevant to be admissible.

### 3. *Traub's Opinion on Troublé's Damages*

■ More problematic is Traub's opinion regarding damages. In addition to his lack of experience in assessing customer confusion, Traub appears to have no experience calculating damages. In his supplemental report, Traub estimated that Troublé would have to spend an additional $100,000 per store in the first year of a new store to overcome the confusion created by Wet Seal's mark. *See* Traub Supp. Report at 3. This estimate was entirely based on the budgeted expenses of one store in a shopping mall in California. *See id.* Without more, Traub's estimation is pure speculation and lacks the "intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho,* 526 U.S. at 152, 119 S.Ct. 1167. Accordingly, the Court orders that Traub's testimony on customer confusion and damages, his two reports, and any opinions related to customer confusion and damages based on those reports be excluded at trial. *See* Fed.R.Evid. 703.

### E. *TROUBLÉ'S MOTION TO PRECLUDE WET SEAL FROM ASSERTING AN ADVICE OF COUNSEL DEFENSE*

Troublé seeks to bar Wet Seal from asserting an advice of counsel defense, arguing that such a defense is improper because Wet Seal asserted the attorney-client privilege throughout discovery. Wet Seal maintains that it has no intention of using this defense at trial. As a qualifica-

---

**9.** In trademark infringement cases, likelihood of confusion is typically established through expert reports based on consumer surveys. *See, e.g., Schering Corp. v. Pfizer,* 189 F.3d 218 (2d Cir.1999); *Conopco, Inc. v. Cosmair, Inc.,* 49 F.Supp.2d 242 (S.D.N.Y.1999); *Bacardi and Co., Ltd. v. New York Lighter Co.,* 54 U.S.P.Q.2d 1335 (E.D.N.Y.2000); 5 J.T. McCarthy, *Trademarks and Unfair Competition,* § 32:158 (4th ed.2001). Although such surveys are only one example of evidence that can been used, their frequent use illustrates a common approach to objectively assess the mental impressions of customers.

tion, Wet Seal contends that if Troublé alleges at trial that it did not consult counsel, Wet Seal should be permitted to refute the allegation.

■ It is well established that the attorney-client privilege cannot at once be used as a shield and a sword. *See United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir.1991) (citing *In re von Bulow*, 828 F.2d 94, 103 (2d Cir.1987)). A defendant may not use the privilege to prejudice his opponent's case or to disclose some selected communications for self-serving purposes. *Id.* (citing *In re von Bulow*, 828 F.2d at 101–02). Accordingly, the privilege may implicitly be waived when defendant asserts a claim that in fairness requires examination of protected communications. *Id.* (citing *United States v. Exxon Corp.*, 94 F.R.D. 246, 249 (D.D.C.1981)).

■ When a party intends to rely at trial on the advice of counsel as a defense to a claim of bad faith, that advice becomes a factual issue, and "opposing counsel is entitled to know not only whether such an opinion was obtained but also its content and what conduct it advised." *Vicinanzo v. Brunschwig & Fils, Inc.*, 739 F.Supp. 891, 894 (S.D.N.Y.1990). A party who intends to rely at trial on the advice of counsel must make a full disclosure during discovery; "failure to do so constitutes a waiver of the advice-of-counsel defense." *Id.*

■ Here, Wet Seal waived any available advice of counsel defense by objecting, based on the attorney-client privilege, to Troublé's discovery requests related to the registration of Wet Seal's mark. Furthermore, in its motion papers, Wet Seal asserts that the issue is moot because it has no intention of using an advice of counsel defense. (Defendant's Memorandum of Law in Opposition to Plaintiff's Motion *In Limine* to Preclude Defendant

from Asserting an Advice of Counsel Defense, dated July 20, 2001, at 2.) However, one of Wet Seal's proposed jury instructions contradicts this assertion. *See* Joint Proposed Jury Instructions at 44 ("If you find that Wet Seal ... relied on the advice of counsel, then you may consider that as evidence that it acted in good faith."). Based on the foregoing discussion, this instruction is improper. If, at trial, Troublé alleges that Wet Seal selected its mark in bad faith, Wet Seal may not refer to any evidence of advice of counsel in response. However, if Troublé argues that Wet Seal did not seek advice of counsel, it may rebut this argument generally without referring to any reliance on the advice or related good faith.

## F. TROUBLÉ'S MOTION TO PRECLUDE CERTAIN TESTIMONY OF WET SEAL'S DAMAGES EXPERT

Troublé moves to preclude Woodford's testimony on her proposed theory of apportionment of profits, if Wet Seal is found to be liable. Under the Lanham Act, if a defendant is held liable for trademark infringement, a plaintiff is entitled, "subject to the principles of equity," to recover: "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a). Section 1117(a) further provides that, "[i]n assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all the elements of cost or deduction claimed." *Id.*

Despite this language, the apportionment of profits is often a rough calculation. There is a general presumption that an infringer's sales of goods bearing the infringing mark were due to the selling power of the mark and not any other cause. *See* 5 McCarthy, *supra*, § 30:65 at 30–129 to 30–130; *see also Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 316

U.S. 203, 207, 62 S.Ct. 1022, 86 L.Ed. 1381 (1942) ("In the absence of his proving the contrary, it promotes honesty and comports with experience to assume that the wrongdoer who makes profits from the sales of goods bearing a mark belonging to another was enabled to do so because he was drawing upon the good will generated by that mark.").

 In its motion papers, Troublé argues that it is inappropriate for Woodford to: (1) consider Wet Seal's contribution to the profits obtained from the alleged infringing goods; and (2) to consider a "reasonable royalty" as a *rough measure of* Wet Seal's contribution. Regarding her first argument, Troublé is incorrect. If Wet Seal can prove that certain "noninfringing elements" somehow contributed to the profits of the alleged infringing goods, it is entitled to deduct this from the profits it must disgorge to Troublé. *See Business Trends Analysts, Inc. v. Freedonia Group, Inc.,* 887 F.2d 399, 407 (2d Cir.1989) (stating, under analogous circumstances in a copyright infringement case, "where an infringer's profits are not entirely due to the infringement, and the evidence suggests some division which may rationally be used as a springboard, it is the duty of the court to make some apportionment") (citing *Orgel v. Clark Boardman Co.,* 301 F.2d 119, 121 (2d Cir. 1962)); *see also* 5 McCarthy, *supra,* § 30:65 at 30–130 (citing *Sheldon v. Metro–Goldwyn Pictures Corp.,* 309 U.S. 390, 60 S.Ct. 681, 84 L.Ed. 825 (1940) and *Frank Music Corp. v. Metro–Goldwyn Mayer, Inc.,* 886 F.2d 1545, 1552 (9th Cir. 1989), to suggest that analysis used to apportion profits in copyright infringement context is useful to determine apportionment in trademark infringement cases). However, if the alleged infringing elements of Wet Seal's mark are so "intertwined" with the non-infringing elements,

apportionment may be inappropriate. *See Business Trends Analysts,* 887 F.2d at 407 (citing *Sheldon,* 309 U.S. at 401–02, 60 S.Ct. 681).

Considering Troublé's second argument, it is premature, at this stage, to rule on whether a reasonable royalty can be plausibly used to estimate apportionment of profits if Wet Seal is held liable. In her expert report, Woodford merely suggested the possibility of using a reasonable royalty. *See* Woodford's Report at 15–16 ("Alternatively, one *may* refer to a reasonable royalty as a means of determining what the contribution of the infringed mark is to 'Arden B.' overall sales and profitability.") (emphasis added). Woodford also wrote that Troublé "has failed to produce information that might support the determination of a royalty." *Id.* at 16. Thus, Woodford's inability to fully propose an apportionment theory based on a reasonable royalty is directly related to Troublés' aforementioned failure to provide Wet Seal with full discovery in a timely fashion. Although, the application of a "reasonable royalty" to the apportionment of profits would be a novel approach, it is too early to preclude such an approach as a matter of law.

### G. TROUBLÉ'S MOTION TO EXCLUDE THE TESTIMONY OF CERTAIN WITNESSES

Troublé moves (1) to exclude the testimony of Tara Solomon, described on Wet Seal's witness list as the president of a public relations firm, and Agnès Troublé, the plaintiff in this action; and (2) to prevent Bruce Johnston, a Wet Seal witness, from testifying as an expert.

#### 1. Tara Solomon

 Troublé argues that Solomon's testimony should be excluded because Wet Seal never identified her in discovery, de-

spite several discovery requests seeking information about the marketing and advertising of Wet Seal's mark. She contends that exclusion is proper because Wet Seal failed to seasonably amend it discovery responses, as required by Federal Rule of Civil Procedure 26(e)(2). Wet Seal's response is that it seasonably amended an interrogatory response to identify Solomon three weeks after she was retained. In addition, Wet Seal contends that the timing of its identification of Solomon as a witness did not prejudice Troublé because Solomon's retention occurred in June, 2001, after the time to take depositions had expired.

Notifying one's adversary of a new trial witness after the close of discovery creates some doubt as to good faith. Such a doubt is accentuated here by Wet Seal's failure to explain the delayed timing of its retention of Solomon. Accordingly, Wet Seal is directed to supplement, within seven days from the date of this Order, any discovery requests that relate to the testimony of Solomon. In addition, Troublé is permitted, if she wishes, to take the Solomon's deposition within thirty days from the date of this Order.

### 2. *Agnès Troublé*

■ Wet Seal seeks to call Troublé to testify, among other things, about the creation and history of the "Agnes b." mark. Troublé objects, claiming that she is a "nominal plaintiff" in this action and she is not the best witness to testify about these issues. Despite Troublé's assertions to the contrary, she is not simply an "apex officer" of a corporation who will be unduly harassed and inconvenienced if called to testify. *Cf. Scott v. Dime Savings Bank*, No. 88 Civ. 5495, 1989 WL 140286, *2 (S.D.N.Y. Nov. 16, 1989) (instructing defendant bank to produce official who is familiar with facts of the case instead of

granting plaintiffs' request to depose specific senior officers). She is the sole plaintiff in this action and is likely to have unique information about issues that are highly relevant in this case. Accordingly, Troublé's motion to exclude her own testimony is denied.

### 3. *Bruce Johnston*

■ Troublé seeks to preclude Bruce Johnston, a leasing agent for a mall in California, from testifying as an expert, arguing that Wet Seal never identified him as an expert. Wet Seal maintains that Mr. Johnston will not testify as an expert, he will testify about personal knowledge of his leasing criteria, past dealings with "Agnès b.", and the potential for "Agnès b." to open a store in his mall. The Court agrees that it would be inappropriate, at this stage, to allow Mr. Johnston to testify as an expert, but the Court does not find that any of the proposed subjects of Mr. Johnston's testimony warrant preclusion. Furthermore, to the extent that there is some ambiguity about the nature of his testimony, the Court will take into consideration the fact that Troublé produced evidence related to its damages and "planned expansions" into shopping malls after the close of discovery. *See* Traub Supp. Report at 2–3.

### H. *TROUBLÉ'S MOTION TO EXCLUDE THE CONSUMER SURVEY CONDUCTED BY BRUNO AND RIDGWAY*

■ Troublé argues that Wet Seal's consumer survey, conducted by Bruno and Ridgway, should be excluded because the survey's methodology was flawed and the findings are irrelevant to the issues in this case. For the reasons discussed below, the Court agrees and will exclude Wet Seal's survey.

A survey is probative and may be admitted into evidence to establish actual confusion if it is "fairly prepared and its results directed to relevant issues." *Sterling Drug, Inc. v. Bayer AG*, 14 F.3d 733, 741 (2d Cir.1994) (citing *Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 118 (2d Cir.1984)) (internal quotation marks omitted). Generally, errors in methodology properly go to the weight of the survey evidence. *See Schering*, 189 F.3d at 227–28; *see also Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 875 (2d Cir.1986). A survey, however, must be excluded under Federal Rule of Evidence 403 where it is so flawed in methodology that its probative value is substantially outweighed by its prejudicial effect. *See Schering*, 189 F.3d at 228; *Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 297 (2d Cir.1999); *Arche, Inc. v. Azaleia, U.S.A., Inc.*, 882 F.Supp. 334, 336 (S.D.N.Y.1995); *Toys "R" Us, Inc. v. Canarsie Kiddie Shop, Inc.*, 559 F.Supp. 1189, 1203–05 (E.D.N.Y.1983).

To be probative and meaningful, a survey must rely upon responses from all potential consumers of the product in question. *See Universal City Studios*, 746 F.2d at 118 (citing *Dreyfus Fund Inc. v. Royal Bank of Canada*, 525 F.Supp. 1108, 1116 (S.D.N.Y.1981)); *American Footwear Corp. v. General Footwear Co. Ltd.*, 609 F.2d 655, 660 n. 4 (2d Cir.1979) (universe improper because although survey participants may have once purchased hiking boots, it does not follow that they were presently interested in purchasing hiking boots); *Cumberland Packing Corp. v. Monsanto Co.*, 32 F.Supp.2d 561, 572 (E.D.N.Y.1999) (criticizing survey for not distinguishing "between past users who intend to purchase sugar-substitutes in the future and those who do not").

Mr. Ridgway, Wet Seal's expert, conducted two surveys to test the likelihood of confusion between Troublé's mark and Wet Seal's mark.[10] The universe of potential consumers tested by the surveys was flawed in several respects. Both surveys failed to establish that the interviewees were potential consumers of the clothing in question. It is perhaps logical to assume that the women in the first survey were potential consumers of "Arden B." clothing: they claimed to be familiar with the mark and they were shopping in a mall where the store was located. In the second survey, however, there was no indication that the women were potential consumer of "Agnès b." clothing. The survey was not conducted in close proximity to "Agnès b." stores; in several interview locations, the nearest "Agnès b." store was over twenty miles away.[11] The resulting

**10.** In the first survey, women were screened in malls that contained an "Arden B." store and were interviewed if they were familiar with "Arden B." clothing. Familiarity was determined by asking the women, "Are you familiar with Arden B. clothing? They have a store here in the mall." *See* Bruno and Ridgway Research Associates, Inc., *Consumer Survey Conducted On Behalf Of: Akin, Gump, Strauss, Hauer, & Feld, L.L.P., Agnès Troublé v. The Wet Seal*, dated Oct. 5, 2000 (hereinafter the "Wet Seal survey"), at 6–8. In the second survey, women were screened in markets that contained an "Arden B." store and were interviewed if they were familiar with "Agnès b." clothing. Familiarity was determined by showing the women a card with the "Agnes b." trademark and asking them, "are you familiar with this line of clothing or not?" *Id.*

**11.** In addition, Wet Seal maintains that "Arden B." caters to an entirely different socio-economic market than "Agnès b." See Def.'s Omnibus Mot. at 11–12. It is therefore surprising that Wet Seal's expert chose markets with "Arden B." stores to test for confusion among potential consumers of "Agnès b." clothing. By asking these women about "Agnès b." in a location where an "Arden B." store was present, but far from any "Agnès b." store, it is entirely possible that some women answered questions on the mistaken

flaws in the survey's universe reduce its probative value.

In addition to testing a proper universe, to have substantial probative value, a survey must be designed to examine an accused mark's impression on a potential consumer. *See Conopco v. Cosmair, Inc.,* 49 F.Supp.2d 242, 253 (S.D.N.Y.1999) (citing *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.,* 973 F.2d 1033, 1042 (2d Cir. 1992)). Although no survey can construct a perfect replica of "real world" buying patterns, a survey must use a stimulus that, at a minimum, tests for confusion by roughly simulating marketplace conditions. *See id.* (citing *Cumberland Packing,* 32 F.Supp.2d at 575). Typically, trademark infringement surveys use stimuli, such as pictures, advertisements or clothing, that directly expose potential consumers to the products or the marks in question. *See id.; see also Arche,* 882 F.Supp. at 335–36. The stimuli in Wet Seal's survey were weak at best. They were comprised of the nearby "Arden B." store-fronts and the use of cards with "Agnès b." printed on them.

Regardless of the value of the survey's stimuli, Wet Seal's survey never actually used the stimuli to test for confusion.[12] Rather, they were used to screen the interviewees to determine if they were familiar with a line of clothing. Given the lack

of a proper universe and sample, the poor choice of location, the lack of proper stimuli, and questions that have little or no relevance to issues in the case, the Court finds that the prejudicial effect of Wet Seal's survey substantially outweighs its probative value. *See* Fed.R.Evid. 403. Accordingly, the survey results and any opinion evidence based on them are inadmissible. *See* Fed.R.Evid. 703.

## III. *CONCLUSION*

For the reasons set forth above, it is hereby

**ORDERED** that Wet Seal's motion to bar Troublé from asserting a "reverse confusion" trademark infringement claim is **DENIED**; and it is further

**ORDERED** that Wet Seal's motion to bar Troublé from asserting any claim for monetary damages is **DENIED**; and it is further

**ORDERED** that Wet Seal is permitted, within thirty (30) days from the date of this Order, to conduct additional discovery related to evidence produced by Troublé after March 15, 2001; and it is further

**ORDERED** that Troublé respond, within seven days (7) from the date of this Order, to any unanswered interrogatories and document requests; and it is further

---

assumption that the two marks were the same. Even if this did not happen, there is nothing to suggest that these women were potential consumers of "Agnès b." clothing, simply because they claimed to be familiar with it.

12. The questions in the surveys included questions such as, "Do you think that 'Arden B.' clothing is made and sold by a company that makes or sells any other line of clothing?" and "Do you think the company that makes and sells 'Arden B.' clothing is affiliated, associated or connected with any other women's clothing company?" Rather than test a consumer's confusion, these question

test their awareness of other lines of clothing and company affiliation. If an interviewee spontaneously answered 'Agnès b.' to the second question, there would be some evidence of confusion. But contrary to the assertions the survey's author, Mr. Ridgway, the fact that the majority of interviewees answered 'no' to the second question does little to establish that they would not be confused if they encountered both marks. *See* Dep. of Joseph M. Ridgway, Sr., dated April 11, 2001, at 45 ("I chose those questions as a means of identifying the likelihood of confusion between the two names.").

ORDERED that Wet Seal's motion to exclude the introduction of Troublé's confusion logs as exhibits is **GRANTED**; and it is further

ORDERED that Wet Seal's motion to exclude the testimony of Marvin Traub is **GRANTED** with respect to his two reports and his opinion on customer confusion and damages and **DENIED** with respect to his opinion on Troublé's expansion strategy; and it is further

ORDERED that Troublé's motion to preclude Wet Seal from asserting an advice of counsel defense is **GRANTED**; and it is further

ORDERED that Troublé's motion to preclude certain testimony of Wet Seal's damages expert, Mary Woodford, is **DENIED**; and it is further

ORDERED that Troublé's motion to exclude the testimony of Tara Solomon is **DENIED**; and it is further

ORDERED that Troublé is permitted, within thirty (30) days from the date of this Order, to depose Tara Solomon; and it is further

ORDERED that Wet Seal supplement, within seven (7) days from the date of this Order any discovery responses related to the testimony of Tara Solomon; and it is further

ORDERED that Troublé's motion to preclude Bruce Johnston from testifying as an expert is **GRANTED**; and it is finally

ORDERED that the matter be referred to Magistrate Judge Katz for additional discovery as set forth in this Decision and Order, and should a conflict arise, Judge Katz will have the authority to determine an appropriate resolution.

**SO ORDERED.**