

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-9-2004

# Citizens Fin Grp Inc v. Citizens Natl Bank

Precedential or Non-Precedential: Precedential

Docket No. 03-2868

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Citizens Fin Grp Inc v. Citizens Natl Bank" (2004). *2004 Decisions.* Paper 283.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/283

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

IN THE UNITED STATES COURT OF
APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 03-2868 and 03-3175
_____

CITIZENS FINANCIAL GROUP, INC.

v.

CITIZENS NATIONAL BANK OF
EVANS CITY;
CITIZENS INC; CITIZENS
NATIONAL BANK OF
SOUTHERN PENNSYLVANIA

Citizens National Bank of Evans
City and Citizens, Inc.,

Appellants No. 03-2868
_____

CITIZENS FINANCIAL GROUP, INC.

Appellant No. 03-3175

v.

CITIZENS NATIONAL BANK OF
EVANS CITY; CITIZENS INC;
CITIZENS NATIONAL BANK OF
SOUTHERN PENNSYLVANIA

_____

Appeal from the United States District
Court
For the Western District of Pennsylvania
D.C. No.: 01-cv-01524

District Judge: Honorable Donetta W.
Ambrose
_____

Argued: April 21, 2004

Before: SCIRICA, Chief Judge,
ROSENN and GREENBERG, Circuit
Judges

(Filed: September 9, 2004)

Frederick W. Thieman (Argued)
Thieman & Farrell
436 Seventh Avenue
2312 Koppers Building
Pittsburgh, PA 15219

David M. Kelly
Andrea Anderson
Finnegan, Henderson, Farabow, Garrett &
Dunner
1300 I Street, N.W.
Washington, DC 20005

Ray F. Middleman
Malone, Larchuk & Middleman
Northridge Office Plaza
117 VIP Drive
Northridge Office Plaza, Suite 310
Wexford, PA 15090

Counsel for Appellants in No. 03-
2868

Paul F. Ware, Jr. (Argued)
R. David Hosp
Goodwin Procter
53 State Street
Exchange Place
Boston, MA 02109

_____

OPINION OF THE COURT
_____

<u>ROSENN</u>, Circuit Judge.

This appeal presents a number of questions arising out of a trademark infringement dispute between two banking institutions. The dispute is an outgrowth of aggressive and expansionist banking flowing from the Congressional liberalization in recent years of national banking laws. Citizens National Bank of Evans City (CNBEC) is a community bank founded in 1878 in Evans City, Pennsylvania, north of Pittsburgh, under the name of Citizens Bank of Evansburgh. In 1907, the bank became federally chartered and adopted its current name. The bank also has refered to itself as "Citizens'" in its advertisements, promotional materials, and customer communications. CNBEC now has sixteen branches in the Northwestern region of Pennsylvania.

The Citizens Financial Group, Inc. (CFG) is a subsidiary holding company of the Royal Bank of Scotland. In July 2001, CFG purchased the retail banking operations of Mellon Bank and announced that it would, and in December 2001 did, convert all Mellon branches in Pennsylvania to "Citizens Bank" branches. CNBEC claimed that nine of these former Mellon Bank branches were located near CNBEC branches, and in addition some of the branches in Butler County were located on the same streets. Upon learning of CFG's announcement of its plan to rename the Mellon Bank branches in Pennsylvania as Citizens Bank, CNBEC sent a cease and desist letter to CFG requesting that CFG not use "Citizens" as a name with respect to its Western Pennsylvania branches. CFG responded by filing this suit in the United States District Court for the Western District of Pennsylvania seeking a declaratory judgment that CNBEC could not prevent it from using the name "Citizens." CNBEC answered the complaint by asserting affirmative defenses and a counterclaim alleging trademark infringement and unfair competition under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and unjust enrichment.

CNBEC then filed a motion for a preliminary injunction, which the District Court denied following an evidentiary hearing. On appeal, this Court affirmed the denial. <u>Citizens Fin. Group, Inc. v. Citizens Nat'l Bank of Evans City</u>, 30 Fed. Appx. 24 (3d Cir. 2002). The parties then proceeded to a jury trial at which CNBEC asserted three counter-claims. CNBEC raised two claims of trademark infringement, first that CFG's "Citizens Bank" mark infringed its mark of the word "Citizens" standing alone, and second, that CFG's "Citizens Bank" mark infringed its full "Citizens National Bank" mark. CNBEC also claimed that CFG's conduct constituted unfair competition due to the confusing similarity of the marks and that

CFG had been unjustly enriched by its infringement.

With regard to CNBEC's infringement claims, the jury found that CNBEC had trademark rights in "Citizens," that CFG's use of the "Citizens Bank" mark in CNBEC's market was likely to cause confusion with CNBEC's mark "Citizens," but that CFG's "Citizens Bank" mark would not likely be confused with CNBEC's "Citizens National Bank" mark. The jury rejected CNBEC's claim for damages regarding unfair competition and unjust enrichment.

The District Court thereupon considered CNBEC's motion for a permanent injunction. The Court refused to enjoin CFG's use of its "Citizens Bank" mark in CNBEC's market. Instead, it molded the jury's verdict of infringement in favor of CFG on all of CNBEC's claims and *sua sponte* issued an injunction restraining CNBEC's use of the "Citizens" mark. The injunction requires CNBEC always to identify itself as "Citizens National Bank" in the text of promotional material, advertisements and documents, despite the jury's finding that CNBEC maintained a protected interest in the "Citizens" mark standing alone. CNBEC timely appealed, and CFG cross appealed. We hold that the District Court abused its discretion by denying CNBEC's motion for injunctive relief and issuing an injunction *sua sponte* against CNBEC. Therefore, we will affirm in part and reverse in part.

## I. Background

CNBEC maintains 16 local branches in Northwestern Pennsylvania, twelve in Butler County, three in Northern Allegheny County, and one in Armstrong County. CNBEC acknowledges that the majority of its customers live in Butler County, but asserts that its Allegheny County customers account for about 13% of its total accounts, 20% of its total combined deposit/loan volume, and about 30% of its profits. CNBEC claims that as of August 1, 2001, it had 64,132 accounts in Butler County, 9,886 accounts representing about $50 million in deposits in Northern Allegheny County, 2,806 accounts in Beaver County, and 1,170 accounts in Armstrong County. Prior to CFG's entry into CNBEC's marketplace, CNBEC had been the only "Citizens" retail bank in the area.

### A. CNBEC Advertising

Over the years, CNBEC has spent millions of dollars in advertising its services and diverse products under the marks "Citizens National Bank" and "Citizens." It has advertised in Allegheny County in the North Pittsburgh edition of the *Post Gazette*, the *Tribune Review*, and the *North Hills News Record*, as well as the *Butler Eagle* and some of the smaller newspapers in Butler and Armstrong Counties. The number of advertisements has varied depending upon its campaigns and targets at the time. From time to time, CNBEC has also sponsored local community events in its marketplace such as football programs, ballets, and other sporting events and musical performances, which have been a form of advertising.

3

CNBEC has also advertised campaigns on radio stations covering Allegheny and the surrounding counties and television station KDKA, which covers Western Pennsylvania and the entire Greater Pittsburgh area. In addition, it has placed flyers in customer statements, utilized billboards for outdoor advertising in the Gibsonia, Slippery Rock and Butler areas, and for the past five years prior to the jury trial, it has maintained a wall painted on the Masonic Building in the City of Butler with its logo, the name "Citizens"and the tag line "The Uncommon Bank." It also has placed listings in numerous telephone directories circulated throughout the Pittsburgh area and has issued numerous press releases each year in its claimed market. CNBEC has issued hundreds of thousands of its checks and debit cards, carrying its mark, to its customers and merchants.

CNBEC witnesses testified that at least since the 1950s, employees and customers have referred to it as "Citizens." Competing banks in that market as well as the media also refer to CNBEC as "Citizens."

Since at least 1995, the bank policy with respect to the use of its name has been that the first time the bank's name was used, the entire bank name, Citizens National Bank, should be used. Subsequent uses can be either "Citizens" or "Citizens National Bank." For example, an advertisement offered in evidence for CNBEC's 18-month CD carries at its top only "Citizens" but at the bottom in much smaller print appears "Citizens National Bank." The record contains more than seventy-five CNBEC advertisements and promotional materials that refer to CNBEC as "Citizens" predating CFG's acquisition of the Mellon banks. In another fifty instances, "Citizens" appears as the first reference to the Bank. During 2001, the year CFG opened its doors in the CNBEC marketplace as "Citizens Bank," CNBEC spent $366,000 for print advertising. In the year 2002, it spent $247,000 on print advertising.

B. Consumer Confusion

In the town of Wexford in Allegheny County, and in Butler, Zelienople, and Saxonburg in Butler County, CFG's branches are located on the same street as CNBEC's branches. Both banks frequently refer to themselves simply as "Citizens. CFG's full-page newspaper announcement in the Pittsburgh Post-Gazette of its acquisition of the Mellon banks referred to itself as either "Citizens" or "Citizens Bank" five times. Another contained the headline "Welcome to Citizens," and others referred to itself in the text as simply "Citizens" with "Citizens Bank" and its logo at the bottom of the page.

Similar to CNBEC, CFG also introduced many financial products with "Citizens" and with "Citizens Bank" and logo at the bottom of the ad. Examples are the introduction of banking products and services available for law firms, Citizens SBA program, and Citizens business owners, commercial banking and

4

international services "by one of the largest banks in the world," the Citizens Circle Money Market Account, Citizens Phone Bank, Citizens Fixed-Rate Annuities, Citizens Circle Gold Checking Account, and Citizens Business Premium Money Market Account.

CNBEC produced testimony of CFG customers mistakenly doing business with CNBEC branches, attempting to cash CFG checks, depositing money and making loan payments on CFG loans. CFG customers also used CNBEC's ATM machines believing they were CFG's and called CNBEC branches with respect to CFG accounts and promotions. CNBEC employees alleged to have recorded more than 2000 instances of confusion during the current litigation.

CNBEC also produced at trial as expert witnesses, Dr. Maureen Morrin of Rutgers University and Dr. Vihas Mital of the University of Pittsburgh. Dr. Morrin testified that CFG's mark is likely to cause consumer confusion because Citizens National Bank and Citizens Bank are essentially identical in consumers' minds due to consumers' tendency to shorten brand names in speech and memory. To consumers, CFG's and CNBEC's marks are both "Citizens." Moreover, Dr. Morrin pointed out that both banks in their promotional materials, print ads and web sites commonly refer to themselves as just "Citizens."

Dr. Morrin also noted that another contributing factor to the likelihood of confusion is that the branch names and the logos are remarkably "similar in appearance." Dr. Morrin opined that the word "national" in CNBEC's name is not very helpful in enabling consumers to differentiate between the two banks because "national" is commonly used in bank names, and it is an abstract word. It is hard to visualize a concrete image of an abstract word, she testified, and "humans have a hard time storing and retrieving abstract words in their memory."

Based on a survey of consumers in the Pittsburgh area, Dr. Mital testified that an overwhelming majority shortened the bank's name and referred to Citizens Bank as "Citizens." He also conducted a survey of adult banking consumers in the four county area of Allegheny, Butler, Beaver, and Armstrong. According to that survey of 300 people, respondents supplied 1057 bank names. Of the 1057 names, 71% of those names were shortened. With respect to Citizens Bank, 76% "shortened the name to just 'Citizen' or 'Citizens.'"

CFG admitted that CNBEC customers tried to make deposits into CFG accounts, make payment on CNBEC loans, cash CNBEC checks, or use ATMs at CFG branches, all under the belief that they were banking with CNBEC. However, CFG claimed that the instances of confusion were minimal and decreased after the conversion of Mellon branches to Citizens Bank branches was completed.

CFG offered into evidence its trademark registration of the name "Citizens Bank" and its service mark in the United States Patent and Trademark Office

dated August 28, 2001, as well as federal trademark registrations for various service marks such as Citizens Select Gold, Citizens Circle and Citizens Nouvelle Credit Program. All of these trademarks and service marks were registered with the United States Patent Office between March 11, 1997 and March 18, 2003.

CFG leveled its attack on CNBEC's claim of seniority to the use of "Citizens" by eliciting evidence through cross examination of inconsistencies in the testimony of CNBEC's witnesses, exaggerations in its geographic claims as to its market area, and the weakness of "Citizens" as a mark. CNBEC's president, Margaret Wier, admitted that CNBEC had no trademark in the words "Citizens Bank" and had not used those words to represent her institution. CFG also offered in evidence a communication from an assistant in CNBEC's marketing department, Sue Kushonardit, to CNBEC's branch managers and commercial loan managers, advising them that "CFG's corporate colors are green and the logo is uniquely different from our own."

Counsel for CFG developed through cross examination of CNBEC's president that its principal advertising agency, Larson O'Brien Acumens, offered some suggestions to its vice-president, Betsy Rab, in February 2002, that would add to the confusion of the public with respect to the two banks, thereby strengthening CNBEC's legal case. CNBEC's president conceded that these suggestions amounted to dirty tricks but CNBEC "did not implement any" of them.

C. Jury Instructions, the Verdict and the Injunction

After instructing the jury generally on the law with respect to the burden of proof, the Court informed the jury that it would be the Court's responsibility to determine whether CFG would prevail on its claim seeking the right to use its registered mark "Citizens Bank" in the disputed areas of Pennsylvania. The Court explained that the jury's role would be to determine whether CNBEC would obtain judgment on its claims of trademark infringement, unfair competition, and unjust enrichment.

The Court provided the jury with a general background in trademark law, noting that the two major objectives in the law regarding trademarks are to protect customers from becoming confused or misled as to the source from which products or services originate, and to protect the owner's value and business goodwill associated with his or her trademark. The Court explained that even though CFG obtained federal registration for its marks, CNBEC can still prevent CFG from using its registered marks in its market area by demonstrating that CNBEC has a protected interest in the mark and that a likelihood of confusion would result if CFG also used the mark in the same market area. On the other hand, the Court noted that if there is no likelihood of confusion "between CFG's Citizens Bank mark and CNBEC's marks, then both parties can use their respective marks in all areas."

6

The Court outlined for the jury the factors to be considered in determining whether there was a likelihood of confusion and the weight to be given to each. The Court explained that if CNBEC has established the right to the word "Citizens" standing alone as a trademark, the jury must place the mark into one of four groups in the spectrum of distinctiveness. These four groups listed in order from the strongest to weakest are, (1) fanciful and arbitrary, (2) suggestive, (3) descriptive, and (4) generic. The Court commented that "fanciful or arbitrary and suggestive marks are considered inherently distinctive and are entitled to immediate protection." See also Checkpoint Sys., Inc. v. Check Point Software Technologies, Inc., 269 F.3d 270, 282 (3d Cir. 2001) (explaining the four levels of trademark distinctiveness).[1]

_____

[1] The Court also instructed the jury on the determination of whether CNBEC's "Citizens" mark had acquired a secondary meaning, whereby a significant portion of the public associates banking services under the name "Citizens" as coming from a single source. However, because the jury found the mark "Citizens" to be either suggestive or arbitrary/fanciful on the distinctive scale, it was not required to address secondary meaning in order to find that CNBEC had a protected interest in the "Citizens" mark and that there was a likelihood of confusion with CFG's marks. See Checkpoint Sys., 269 F.3d at 283 n.10 (describing how even a

The Court concluded its jury instruction with an explanation of the damages sought by CNBEC and the elements that must be proven for such relief. The Court then submitted to the jury a verdict slip which contained fifteen questions. The first six questions and the responses of the jury are pertinent to our review.

QUESTION #1: Do you find that CNBEC has proven by a preponderance of the evidence that CNBEC has used "Citizens" standing alone as a trademark?

JURY: Yes.

QUESTION #2: Do you find by a preponderance of the evidence that the mark "Citizens" standing alone is ... (A) generic, (B) merely descriptive, (C) suggestive or arbitrary or fanciful?

JURY:(C)

[The Jury was directed to skip to Question #4]

QUESTION #4: Do you find by a preponderance of the evidence that a likelihood of confusion exists between CFG's Marks and CNBEC's "Citizens" standing-alone mark?

JURY: Yes.

QUESTION #5: Do you find by a preponderance of the evidence that a likelihood of confusion exists between

_____

descriptive mark may be entitled to strong protection if it has developed a secondary meaning).

7

CFG's Marks and CNBEC's "Citizens National Bank" mark?

JURY: No.

QUESTION #6: Do you find by a preponderance of the evidence that CNBEC has proven that is has been injured as a proximate result of CFG's infringement?

JURY: No.

After answering "No" to Question #6, the verdict slip informed that jury that it had found a verdict in favor of CFG and that its task was complete.

Several days later, the Court considered CNBEC's application for a permanent injunction. Although labeled a hearing, there was no jury, no evidence presented, or oral argument. The Court concluded on the briefs submitted by counsel for the parties that an injunction against CFG should not issue. The Court arrived at this result by balancing the equities and considering the factors enumerated in §35 of the Restatement (Third) of Unfair Competition (1995). The Court determined that CNBEC had not proven bad faith or that CFG had deliberately infringed on CNBEC's marks. It concluded that a full injunction directed to CFG would have devastating effects on its business and its customers, not only in CNBEC's market area but throughout Pennsylvania, a consequence even beyond the scope sought by CNBEC. However, it did not offer a descriptive explanation for this awesome prediction.

With respect to the public interest,

the Court concluded that an injunction would increase confusion rather than prevent it. The Court reasoned that if CFG were required to change its name in CNBEC's market area as a result of an injunction, it would still be required to indicate to consumers that it was owned by or otherwise affiliated with Citizens Bank. Also contributing heavily to the Court's decision was a determination that there was evidence of "unclean hands" on the part of CNBEC in this litigation, and that such evidence "is significant." The Court concluded that this factor weighed heavily against the granting of a full injunction. It also believed that granting an injunction against CFG would be difficult, if not impossible, to enforce because it had its own trademark rights in areas other than CNBEC's market area. The Court asserted that the use of broad ranged media for the purposes of advertisements and the increasing use of internet banking added to the difficulty. Instead of granting an injunction against CFG, the Court *sua sponte* concluded that the principles of equity and the record in this case compelled it to impose an injunction requiring CNBEC to use the term "National" as part of its name when it first refers to itself in any document, advertising, or promotion, regardless of the type or medium used. The Court thereupon molded the verdict entered by the jury and entered a verdict in favor of CFG on its declaratory judgment claim and against CNBEC on all of its counterclaims.

## II. Evidentiary Rulings

The four issues raised by CNBEC

8

on appeal are: (1) the refusal of the District Court to enjoin CFG's use of its "Citizens Bank" mark after a jury determined that it infringed CNBEC's "Citizens" mark; (2) the District Court's exclusion of CNBEC's proffered expert testimony regarding a likelihood of consumer confusion between the parties' marks; (3) the District Court's exclusion of evidence of purported consumer confusion; and (4) the Court's admission of evidence of third-party use of the word "Citizens" in trademarks outside of the relevant marketplace and the Court's subsequent jury instruction that these third-party marks were relevant to a determination of the commercial strength of CNBEC's "Citizens" mark.

In its conditional cross-appeal to be considered only if this Court reverses any of the District Court's rulings, CFG contends that the District Court erred in admitting generalized hearsay testimony concerning unspecified instances of alleged confusion and in formulating its jury instruction concerning the definition of "use" of the term "Citizens" for purposes of acquiring trademark rights.

We turn first to CNBEC's arguments regarding the District Court's evidentiary rulings.

## A. Exclusion of CNBEC's Proffered Expert Testimony

CFG filed a pre-trial motion to preclude proposed expert testimony of Robert Reitter on behalf of CNBEC on the ground that his survey relied on an "improper universe" because the survey was conducted outside of CNBEC's market. Reitter interviewed people at two malls in Allegheny County, Ross Park Mall and Robinson Towne Center. The Court agreed with CFG and excluded the testimony. CNBEC now appeals this evidentiary ruling. The District Court's decision to exclude proposed expert testimony under Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993), is reviewed for an abuse of discretion. Montgomery County v. Microvote Corp., 320 F.3d 440, 445 (3d Cir. 2003).

The District Court was concerned about the propriety and trustworthiness of Reitter's survey. A "universe" is "that segment of the population whose perceptions and state of mind are relevant to the issues in the case." McCarthy on Trademarks and Unfair Competition § 32:159 (4th ed. 2003). "A survey of the wrong 'universe' will be of little probative value in litigation." Id. The Court noted that the proponent of the survey bears the burden of proving that the universe is proper. Id.; see also 3A Callmann on Unfair Competition, Trademarks and Monopolies § 21:67) (4th ed. 2001).

It is not disputed that the consumer confusion at issue here is known as "reverse confusion." "Reverse confusion occurs when a larger, more powerful company [here, CFG] uses the trademark of a smaller, less powerful senior owner [here, CNBEC] and thereby causes likely confusion as to the source of the senior user's goods or services." Fisons Horticulture, Inc. v. Vigoro Industries, Inc., 30 F.3d 466, 474 (3d Cir. 1994). The

District Court observed that "in reverse confusion cases . . . the appropriate universe is the 'senior user's [i.e. CNBEC's] customer base." Citizens Fin. Group, Inc. v. Citizens Nat'l Bank of Evans City, No. 01-1524, slip op. at 7 (W.D. Pa. Apr. 23, 2003) (citing McCarthy § 32:159).

The Court then considered evidence showing that CNBEC operated sixteen branches in Butler County, no branches in Beaver County, one branch in Armstrong County, and three branches in northern Allegheny County near the Butler County line. The District Court stated "[f]or the past 108 years, CNBEC and its predecessors in interest have offered retail banking services in this area and not beyond. Thus, in this case there can be no doubt that CNBEC's customer 'base' is within Butler county and extreme northern Allegheny county rather than Allegheny county as a whole." Id. The Court noted that "[t]he closest CNBEC branches are 7 and 17 miles, respectively, away from the malls," and the remaining branches were "further away." Id. at 8.

The Court disagreed with CNBEC's argument that the universe at issue consisted of potential customers of both parties because the universe in a reverse confusion case should be limited to the senior user's customer base. See McCarthy § 32:159; 3A Callmann § 21:67. The Court noted that Reitter testified, and CNBEC acknowledged at the hearing, that he and CNBEC would have preferred to conduct the survey at Clearview Mall in Butler County but that mall refused to

allow Reitter to conduct the survey there. Reitter also acknowledged that he could have conducted the survey somewhere else in Butler County, but it would have been more difficult. However, "[t]he geographical area surveyed cannot be based on mere sampling convenience rather than upon scientific or sampling grounds." McCarthy § 32:161.

The Court further disagreed with CNBEC's argument that its "universe" should include all of Allegheny County because it had a marketing presence beyond Butler County in the Greater Pittsburgh area. Specifically, the Court noted that "[t]he scope, media type, volume, and frequency of [CNBEC's] advertising and promotional efforts regularly focus[ed] on Butler county, not Allegheny county," and that "the evidence indicates that CNBEC's advertising and marketing efforts outside of Butler County are sporadic." Citizens Fin. Group, No. 01-1524, slip op. at 9. The Court determined that any customers that CNBEC may obtain outside of their main customer base of Butler County and Northern Allegheny county would be "spill over" which would not be a part of CNBEC's customer base. Id. The Court also rejected some of the methodology used by Reitter in his survey questions as being vague, imprecise, overly inclusive, or overly exclusive. Id. at 9-10.

Exercising its role as the "gatekeeper" regarding the proffered expert witness testimony, the Court concluded that Reitter's report was too fundamentally flawed to be admissible. Id.

10

at 10. The Court therefore excluded the proffered testimony under Daubert and Federal Rule of Evidence 702. Alternatively, the Court excluded the testimony under Federal Rule of Evidence 403, concluding that the danger of unfair prejudice far outweighed the minimum probative value of Reitter's testimony. Id. at 11. See, e.g., Trouble v. The Wet Seal, Inc., 179 F. Supp. 2d 291, 306-308 (S.D.N.Y. 2001). The Court explained that "[i]f the universe is skewed, then the conclusion will similarly be skewed. If an expert, a person with special knowledge and expertise, testifies as to the skewed results, a jury is likely to give special weight to the skewed conclusion." Id.

CNBEC argues that Reitter's survey constitutes highly probative evidence of likelihood of confusion and that the Court erred in excluding the evidence from consideration by the jury. According to CNBEC, 152 of the 213 respondents, or 71%, exhibited "reverse confusion" either by identifying a CFG location in response to the CNBEC advertisement or stating that the bank in the CNBEC advertisement was affiliated with Mellon Bank.

CNBEC argues also that the Court misinterpreted case law regarding the composition of an appropriate survey universe in a reverse confusion case. Specifically, it takes issue with the Court's conclusion that in a reverse confusion case, the universe is limited to the senior user's "customer base." CNBEC argues that the Court's conclusion was based on two treatises, McCarthy and Callman, both of which relied on a single court decision, Sterling Drug, Inc. v. Bayer AG, 14 F.3d 733 (2d Cir. 1994), but that Sterling did not support the Court's exclusion.

CNBEC also takes issue with the Court's factual findings, contending that shoppers at both malls have access to its banking services, and that Reitter's methodology and use of a "screener" question was proper. Finally, CNBEC argues that the Court's "critique" of Reitter's methodology should affect only its weight but not its admissibility. See Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134, 1143 (9th Cir. 1997), United States v. 88 Cases, etc., 187 F.2d 967, 974 (3d Cir. 1951); 5 McCarthy § 32:162 (selection of an inappropriate universe generally affects the weight of survey and not its admissibility).

In Sterling, 14 F.3d 733, a United States drug company sued Bayer AG, a German drug company, for infringement of the trademark "Bayer" in Sterling's market. Both companies held rights in the trademark for historical reasons. Id. at 737. It was undisputed that Sterling was a senior user of the trademark in its market. Id. at 738. The Sterling court rejected Bayer AG, the junior user's, argument that a consumer survey regarding likelihood of confusion should include Bayer AG's customer base in the United States. Id. at 741. The Court held that under the theory of reverse confusion, as opposed to the traditional theory of confusion, the universe was limited to the senior user's customer base. Id.

11

Sterling's holding was cited with approval by the two leading treatises and was the position adopted by the District Court here, that is, the proper universe under CNBEC's theory of reverse confusion was limited to CNBEC's customer base, not to CFG's customer base. CNBEC interprets Sterling to mean that the universe should include consumers whose perceptions are at issue and have access to the marks of both parties. However, in our view, Sterling does not stand for such a proposition. The Sterling court stated that "[w]here, as here, the relevant issue is whether consumers mistakenly believe that the senior user's products actually originate with the junior user, it is appropriate to survey the senior user's customers." Id. at 741. Although Sterling dealt with a difference between the junior and senior users' customers based on products, as opposed to different geographic regions, the rule is the same. The court should limit survey evidence in reverse confusion cases to the customers of the senior user. We do not believe that the District Court abused its discretion in determining that the consumers surveyed in this case were located outside of CNBEC's customer base.

CNBEC's argument that any problems of Reitter's survey should have affected only its evidentiary weight but not its admissibility is also unpersuasive. The District Court excluded the survey because Reitter's methodology was fundamentally flawed and because the danger of undue prejudice far outweighed the limited probative value of the survey, especially

for a jury. The courts have held generally that mere technical unreliability goes to the weight accorded a survey, not its admissibility. See, e.g., Southland Sod Farms, 108 F.3d at 1143. The Court in this case concluded that Reitter's survey did not suffer from mere technical flaws, but from fatal flaws. Thus, the Court appropriately fulfilled its duty as a gatekeeper in excluding this evidence.

Finally, CNBEC has failed to show that the Court committed plain error in its findings of facts as to what constituted its customer base. The Court cited CNBEC's own documentary evidence to make the determination that it had business primarily in Butler County and in the northern tip of Allegheny County. CNBEC has also failed to show that the Court committed plain error regarding whether its shoppers at the two malls were within the universe of CNBEC's customer base and whether Reitter's "screener" question was proper. Accordingly, we hold that CNBEC has failed to show an abuse of discretion by the District Court and affirm its ruling to exclude the proffered expert testimony.

B.    Exclusion of Certain Written Evidence Purporting to Show Instances of "Actual Confusion"

CNBEC also attacks the District Court's establishment of guidelines to insure that CNBEC's "confusion log" entries prepared by CNBEC's employees satisfied the Federal Rules of Evidence before being admitted. CFG filed a

12

pretrial motion to exclude CNBEC's "confusion log" entries as inadmissible hearsay. CNBEC conceded that log entries were hearsay, but argued that they fell within the present sense impression exception under Fed. R. Evid. 803(1). The Court granted in part and denied in part CFG's motion and established guidelines for the admissibility of CNBEC's log entries under the "present sense" exception.

CNBEC does not dispute the Court's disposition of its argument regarding the exceptions to the hearsay rule. Rather, CNBEC specifically challenges the Court's two guideline requirements: requiring log entries to (1) "specifically mention Mellon or CFG" and (2) "describe the specific evidence of the direct link to Mellon or CFG in either the form of (a) 'documentary evidence,' such as specifically referring to a deposit slip, or (b) 'a clear and specific statement by the customer.'" Citizens Fin. Group, No. 01-1524, slip. op. at 14. The guidelines also required exclusion of log entries that reflected "the thought process, conclusion, analysis or interpretation" of the CNBEC employees who recorded the entries. Id. at 15. CNBEC asserts that the Court "[cited] no legal support and [articulated] no rationale for its heightened evidentiary requirements" and that the Court's requirements were inconsistent with the standards of admissibility under Fed. R. Evid. 803(1). We review the District Court's guidelines for abuse of discretion. United States v. Saada, 212 F.3d 210, 220 (3d Cir. 2000).

In general, "actual confusion" evidence collected by employees of a party in a trademark action must be viewed with skepticism because it tends to be biased or self-serving. See Checkpoint Sys., 269 F.3d at 298 ("the District Court properly took into account the potential bias of the Checkpoint System's employees who testified [regarding actual confusion]."); A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 227 (3d Cir. 2000) ("The District Court, while not explicitly discrediting this evidence, viewed it with great skepticism, given the interested sources and the inability to cross-examine the supposedly confused individuals."). It was, therefore, proper for the District Court here to establish guidelines to ensure that the evidence met the standards of the Federal Rules of Evidence.

Witnesses for both CFG and CNBEC acknowledged that customer confusion between banks frequently occurred, regardless of bank names. "Ownership of a trademark does not guarantee total absence of confusion in the marketplace. Selection of a mark with a common surname naturally entails a risk of uncertainty and the law will not assure absolute protection." Scott Paper Co. v. Scott's Liquid Gold, Inc., 589 F.2d 1225, 1231 (3d Cir. 1978). The Court was familiar with the evidence gathered during discovery and was in the best position to determine the safeguards for relevance and reliability in this case. The Court did not abuse its discretion in requiring CNBEC's written evidence to specifically refer to

CFG or Mellon to ensure that the jury received only relevant evidence. Saada, 212 F.3d at 220.

Likewise, the Court did not abuse its discretion in requiring CNBEC's evidence to exclude entries that reflected the thought process, conclusion, or interpretation of the CNBEC employees who recorded the entries. It was proper for the Court to make such requirement under Fed. R. Evid. 803(1). See United States v. Guevara, 277 F.3d 111, 127 (2d Cir. 2001) (upholding determination that hearsay statements did not qualify as "present sense impression" under Rule 803(1) because they "were conclusions based upon information [the recorder] had processed rather than contemporaneous or spontaneous statements that were inherently trustworthy") reh'g denied, 298 F.3d 182 (2nd Cir. 2002); Vitek Sys., Inc. v. Abbott Labs., 675 F.2d 190, 194 (8th Cir. 1982) (concluding that hearsay memorandum did not qualify as present sense impression because company sought to elicit its employee's evaluation of the customer's thought process). Nonetheless, the District Court's guidelines permitted written hearsay evidence that reflected "an explanation or description of the event rather than a narration." The guidelines conformed to the requirements of Rule 803(1). We, therefore, conclude that the Court did not abuse its discretion and did not err in setting up the guideline requirements.

C.    The Discussion of Evidence of Widespread Third-Party Use of the Word "Citizens" by Other Banking Institutions

CFG introduced evidence showing that "Citizens" was commonly used by banks both in Pennsylvania and throughout the United States: 8 banks, in addition to CFG, use "Citizens" in Pennsylvania; banks with "Citizens" in their name coexist in six zip codes in Pennsylvania; more than 350 FDIC-insured banks use "Citizens" in their trade names throughout the United States and they operate more than 2,400 separate branches; "Citizens" is the ninth most commonly used bank name; and approximately 4% of FDIC-insured banks have Citizens in their names. CNBEC appeals from the District Court's denial of its motion *in limine* to exclude evidence of widespread third-party use of Citizens-formative trademarks outside its market area.

In this case, the jury found that CNBEC had used the mark "Citizens," that the mark was very distinctive (either "suggestive," "arbitrary," or "fanciful"), and that there was a likelihood of confusion between CFG's marks and CNBEC's "Citizens" mark. Thus, the jury found infringement by CFG, and CNBEC prevailed on this claim. Yet, CNBEC argues that the Court erred in allowing evidence of widespread third party use because it "is not relevant to determining the strength of CNBEC's mark within its marketplace." We need not tarry on this issue. First, as a general rule, widespread use of even a distinctive mark may weaken the mark. See, e.g., Petro Stopping Ctrs, L.P. v. James River Petroleum, Inc., 130 F.3d 88, 93-94 (4th

Cir. 1997) (explaining how evidence of broad third party use of a suggestive mark may be relevant to show the weakness of the mark). Thus, we believe this evidence was likely relevant. Further, any conceivable error was harmless because the jury found in favor of CNBEC on this issue of infringement and the strength of its mark. Accordingly, we will not reverse the admission of this testimony.

### III. Molding the Verdict

Announcing its decision to deny injunctive relief to CNBEC, and instead to enjoin CNBEC, the District Court explained that it was "molding the verdict entered by the jury and entering a verdict in favor of CFG and against CNBEC on the declaratory judgement claim and on all counterclaims filed by CNBEC against CFG." This "molding" is troublesome, given that the jury found that CNBEC had a protected interest in the mark "Citizens," and that there was a likelihood of confusion between the marks, constituting CFG's infringement on CNBEC's mark. The District Court had informed the jury during its instructions that "if you find that there is a likelihood of confusion caused by CFG's use of the mark Citizens Bank, then CNBEC will be able to prevent CFG from using the mark Citizens Bank in those areas where CNBEC has established a significant market presence."

The Supreme Court observed in Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd., 369 U.S. 355, 364 (1962):

Where there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way. For a search for one possible view of the case which will make the jury's findings inconsistent results in a collision with the Seventh Amendment.

Our circuit has interpreted Atlantic & Gulf Stevedores to mean that "a verdict must be molded consistently with a jury's answers to special interrogatories when there is *any view* of the case which reconciles the various answers." McAdam v. Dean Witter Reynolds, Inc., 896 F.2d 750, 763 (3d Cir. 1990) (quoting Bradford-White Corp. v. Ernst & Whinney, 872 F.2d 1153, 1159 (3d Cir. 1989), cert. denied, 493 U.S. 993 (1989) (emphasis added). Thus, trial courts must proceed "under a constitutional mandate to search for a view of the case that makes the jury's answers consistent." McAdam, 896 F.2d at 764 (quoting United States v. 0.78 Acres of Land, More or Less, 81 F.R.D. 618, 621 (E.D.Pa. 1979) aff'd without opinion, 609 F.2d 504 (3d Cir. 1979).

In our view, the District Court's "molding" in this case has produced a collision with the Seventh Amendment. The District Court submitted interrogatories to the jury under Fed. R. Civ. P. 49(b) to decide those issues of fact necessary for a verdict. In response to the Court's first interrogatory, the jury found

15

in the affirmative that CNBEC had proven that it had used "Citizens" standing alone as a trademark. In response to the second interrogatory, it found that the mark "Citizens" standing alone was suggestive, arbitrary or fanciful. Skipping to the fourth interrogatory, the jury also found in the affirmative that a likelihood of confusion existed between CFG's mark and CNBEC's "Citizens" standing-alone mark. Taken together, these responses constituted a finding that CFG had infringed on CNBEC's trademark. However, in the sixth interrogatory, the jury found that CNBEC had not been "injured" by the infringement, meaning that no money damages would be awarded.

The critical question in "molding" cases such as this is "whether the jury's answers in the verdict are necessarily inconsistent with each other." Loughman v. Consol-Penn. Coal Co., 6 F.3d 88, 104 (3d Cir. 1993). Upon review, we hold that the jury's findings in this case were not inconsistent, and no molding was necessary to harmonize them. It is completely feasible under trademark law that a trademark owner may infringe on another's mark, and yet the senior user may not suffer any economic damages. The "molding" in this case only became necessary when the District Court decided that despite the jury's finding of infringement by CFG over CNBEC's senior rights, it would still grant declaratory judgment in favor of CFG, thereby allowing CFG to use its registered trademark in CNBEC's market area.

The problem which triggered the molding of the verdict originated with the Court's framing of the sixth interrogatory. The Court presided over the lengthy and complex trial before the jury patiently and competently. In framing the sixth interrogatory, however, the District Court erroneously formulated the question in terms of "injury," rather than in terms of monetary damages or unjust enrichment. "Injury" is a much broader concept than the issues of money damages or unjust enrichment which were properly before the jury in this case. An injury is "any wrong or damage done to another, either to his person, rights, reputation, or property." Black's Law Dictionary (5th ed. 1979). Restatement (Second) of Torts § 7 (1965) defines injury as "the invasion of any legally protected interest of another." The jury, however, was not asked to decide the legal rights of the parties; its function was to find facts regarding infringement and arrive at a verdict regarding CNBEC's claims for monetary relief. The District Court instructed the jury that if it found for CNBEC on unfair competition and its trademark infringement claims, it must determine whether "CFG be required to pay CNBEC the monetary damages that CNBEC sustained as a consequence of CFG's wrongful acts." The Court defined actual damages as meaning "the amount of money that will reasonably and fairly compensate CNBEC for an injury you find was caused by CFG's use of the mark 'Citizen's Bank.'" Pursuant to its jury instructions, the Court should have molded the jury verdict, as it may now be required, to reflect the sixth interrogatory to the jury

16

as though it were framed in terms of money damages and unjust enrichment rather than "injury."

We have clearly held that "trademark infringement amounts to irreparable injury as a matter of law." Gucci Am., Inc. v. Daffy's, Inc., 354 F.3d 228, 237 (3d Cir. 2003) (quoting S & R Corp. v. Jiffy Lube Int'l, Inc., 968 F.2d 371, 378 (3d Cir. 1992)). Therefore, the jury's finding of "no injury" must be limited to the context of economic damages. The jury verdict may not be used to supplant the principle that CFG's infringement constitutes a legal injury to CNBEC as a matter of law. The District Court's molding of the jury's verdict to encompass a lack of injury beyond the money damages was in error. It was this error that led the Court to enter judgment for CFG on its complaint for declaratory judgment. Accordingly, the District Court's molding of the verdict and the entry of declaratory judgment for CFG will be reversed. Upon remand, the District Court is instructed to vacate the judgment and to enter judgment in accordance with the jury's finding of infringement by CFG, consistent with this opinion.

## IV. The Injunction

Although we have stated that trademark infringement is an "irreparable injury as a matter of law," id., we have also held that "the irreparable injury we referred to was not intended to swallow the remaining prongs of the permanent injunction inquiry." Gucci, 354 F.3d at 237. With that admonition in mind, we

turn to the District Court's ruling on CNBEC's motion for a permanent injunction.

Several days after the jury returned its verdict, the District Court turned to CNBEC's motion for a permanent injunction to enjoin CFG from offering or advertising retail banking services under the mark "Citizens Bank" in CNBEC's claimed market area. The judge apparently had received memoranda on the issue, but took no new testimony, evidence or oral argument. Without citing any authority except the factors set forth in Restatement (Third) of Unfair Competition § 35, the judge delivered an oral opinion denying CNBEC's motion. Based on the jury verdict finding no likelihood of confusion between CFG's marks and CNBEC's full mark of "Citizens National Bank," the Court, *sua sponte* imposed an injunction on CNBEC requiring it to use the term "National" as part of its name "when it first refers to itself in any document, advertising or promotion regardless of type or medium used."

On appeal, CNBEC argues that the District Court erred by enjoining it from using its shortened "Citizens" mark, and failing to grant its application for a permanent injunction against CFG. Further, CNBEC argues that this Court had never endorsed the "Restatement Factors" that the District Court relied on to reach its decision.

The Restatement (Third) of Unfair Competition § 35(2), upon which the District Court relied, states:

17

The appropriateness and scope of injunctive relief depend upon a comparative appraisal of all the factors of the case, including the following primary factors:

(a) the nature of the interest to be protected;

(b) the nature and extent of the wrongful conduct;

(c) the relative adequacy to the plaintiff of an injunction and of other remedies;

(d) the relative harm likely to result to the legitimate interests of the defendant if an injunction is granted and to the legitimate interests of the plaintiff if the injunction is denied;

(e) the interests of third persons and the public;

(f) any unreasonable delay by the plaintiff in bringing suit or otherwise asserting his rights;

(g) any related misconduct on the part of the plaintiff; and

(h) the practicality of framing and enforcing an injunction.

CNBEC argues that the Restatement Factors have not been adopted by the courts because they are ill-suited for the task of crafting permanent injunctive relief. The factors, it asserts, are better suited in considering preliminary injunctions, which are extraordinary remedies requiring courts to carefully evaluate the "balance of harm" before the ultimate determination of infringement. AM Gen. Corp. v. Daimler Chrysler Corp., 311 F.3d 796, 804 (7th Cir. 2002); Lermer & Germany GmbH v. Lermer Corp., 94 F.3d 1575, 1577 (Fed. Cir. 1996).

We review a District Court's decision to grant or deny a permanent injunction under an abuse of discretion standard. A.C.L.U. of N.J. v. Black Horse Pike Reg'l Bd. of Educ., 84 F.3d 1471, 1476 (3d Cir. 1996). "An abuse of discretion exists where the District Court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact." Id. (quoting Int'l Union U.A.W. v. Mack Trucks, Inc. 820 F.2d 91, 94 (3d Cir. 1987)). "[W]e will not interfere with the district court's exercise of discretion 'unless there is a definite and firm conviction that the court . . . committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors.'" Morgan v. Perry, 142 F.3d 670, 683 (3d Cir. 1998) (citation omitted).

We are hesitant to endorse any finite set of factors for consideration in determining the equities of injunctive relief. In fact, the District Court prefaced its consideration of these factors with the statement that "equity is the key consideration in determining a proper remedy once a likelihood of confusion exists." Even the Restatement (Third) of Unfair Competition § 35(2) explains that weighing injunctive relief requires "a comparative appraisal of all the factors of the case." In order to determine whether

the District Court abused its discretion in this matter, however, we must review the Restatement Factors that were considered.

The first factor, the nature of the interest to be protected, weighed in favor of denying the injunction according to the District Court. The Court explained that even though the jury found "Citizens" standing alone to be CNBEC's lawful trademark, 12 U.S.C. § 22 requires that CNBEC "include in its name the word 'national' when identifying itself." However, this federal statute relating to the organization's Certificate of National Banking Association only requires that persons uniting to form such associations "shall . . . make an organization certificate which shall specifically state: first, the name assumed by such association; which shall include the word 'National.'" 12 U.S.C. § 22. Nothing in this statutory language inhibits a national bank from using a diminutive of its name for advertising purposes, especially when it is so known by its customers or the community it serves. Moreover, the statute expressly requires that the name "National" be used in the organization certificate; it does not address other situations in which the name may be used, and certainly not in advertising media. We see no basis in the statute to support the District Court's assertion.

The Court also explained under the first factor that hundreds of banks throughout the United States use "Citizens" in their name. Yet, this inquiry is appropriate for determining the strength of the mark, which was determined by the jury, not the nature of the mark owner's interest to be protected. The District Court should have focused instead on the actual interests to be protected, i.e. the public interest in avoiding confusion and CNBEC's interest in maintaining control over its mark and avoiding injury to reputation and goodwill. We see nothing in this factor which favors the infringer.

As to the second factor, the nature and extent of the wrongful conduct, the Court was not persuaded that CFG acted in bad faith or that it deliberately infringed on CNBEC's mark. CFG may not have acted in bad faith, but it deliberately advertised in the marketplace where CNBEC had engaged in banking for over one hundred years without any trademark infringement. CFG did not enter CNBEC's marketplace inadvertently; its conduct was deliberately conceived, planned and implemented by a large and aggressive financial organization. Thus, although we accept the District Court's determination that CFG did not act in bad faith, we see nothing in this factor that weighs against an injunction.

Regarding the third factor, the relative adequacy to CNBEC of an injunction, the Court again relied on its overly broad interpretation of the federal statute requiring the inclusion of the word "National" in CNBEC's name. The Court concluded that CNBEC "can protect the values of its trademark" without a permanent injunction prohibiting CFG from using its mark. For the reasons we set forth in our discussion of the first factor, this conclusion of law, although the

District Court stated it as a finding, is without any legal or factual basis. Even though CNBEC may be able to avoid some confusion by using the word "National" in its name, the equities do not necessarily support forcing CNBEC to take such measures given that it is the senior user of the "Citizens" mark and the victim of trademark infringement.

In the fourth factor, a balancing of the relative harm to the legitimate interests of the parties if the injunction is denied, the Court concluded that "[a] full injunction would have devastating effects on CFG's business and its customers" and that "it would potentially prevent CFG from using its name not just in CNBEC's market area, but throughout Pennsylvania . . . ." There is nothing in the record to support these conclusions. First, CNBEC seeks to enjoin CFG, at most, from offering or advertising retail banking services under the mark "Citizens Bank" only in Allegheny, Armstrong, Beaver and Butler counties, and not the rest of Pennsylvania. The District Court also noted that CNBEC did not prove it had penetrated the market in Armstrong and Beaver counties and in the Greater Pittsburgh area.

Thus, an injunction could be easily tailored to CNBEC's proven market area, a modest part of Western Pennsylvania.[2]

Such a limited injunction could in no way "potentially prevent" CFG from using its name throughout Pennsylvania. With a giant institution operating hundreds of branches throughout the east coast of the United States, it is an enormous stretch of imagination to conclude that an injunction limited to several counties in Pennsylvania would have "devastating effects on CFG's business and customers." The record does not support this broad statement.

Furthermore, in considering this factor, the District Court ignored the jury's finding that CFG's use of the "Citizens Bank" mark in the CNBEC market area created a likelihood of public confusion that could harm CNBEC's interest in its mark. The Court simply stated in conclusory fashion that CNBEC "has failed to demonstrate damage to its reputation and goodwill" as a result of CFG's infringement. This statement disregards the record that undisputably shows CNBEC has operated as a bank, at least in Butler County, for over one hundred years and has built substantial community goodwill that it seeks to protect in the future. As we noted in <u>Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency, Inc.</u>, a similar case involving reverse confusion, "[w]e think it a reasonable inference that during

---

[2] According to the United States Federal Census of 2000, of which we take judicial notice, all of Armstrong County had only a population of 55,818

persons eighteen years and older; Beaver County, 140,350; Butler County, 131,235; and all of Allegheny County, including the Greater Pittsburgh Area, 1,000,490.

20

those thirteen years, [the senior user] was able to build up substantial goodwill for its general insurance services under [its] mark." 214 F.3d 432, 443 (3d Cir. 2000) (footnote omitted). In this case, too, we believe that after the use of CNBEC's trademark name in a limited rural area of Western Pennsylvania over many years, its expansion in that area during this period, and the record of its consistent and broad advertisement of its business and name over those many years, one can reasonably infer that infringement against CNBEC's trademark will adversely affect its reputation and goodwill. Balancing the relative harm to the legitimate interests of the parties clearly favors CNBEC and not the infringer.

As to the fifth factor, the interest of third parties and the public, the District Court was of the opinion that a permanent injunction, as requested, would increase confusion rather than prevent it. It reached this conclusion on the supposition that an injunction would require CFG to change its name, but CFG still would be required to indicate to consumers "that it was owned by or otherwise affiliated with Citizens Bank." A tailored permanent injunction, however, need not affect the name for CFG's hundreds of branches outside of the limited area constituting CNBEC's market area. A permanent injunction need not require that CFG operate any branches in CNBEC's marketplace, nor would it bar CFG from operating an independent affiliate under a different name in the enjoined areas.

As we stated in United States Jaycees v. Phila. Jaycees, "avoidance of confusion should always be a major concern of a court in a trademark case," and "actual confusion need not be shown. Rather, only the likelihood of confusion is required." 639 F.2d 134, 142 (3d Cir. 1981). We further stated in that case, "[p]rotection of infringers is not a purpose of the Lanham Act. On the contrary, the Act's objective is the protection of the trademark and the public." Id. We recognize the District Court's legitimate concern that a strict injunction against CFG could cause further public confusion for CFG's customers, particularly considering CFG's national scope and the proliferation of internet banking. However, potential public confusion should not be considered to the exclusion of trademark protection. Rather, we believe that in this case this factor should be read as a mandate to craft injunctive relief that will minimize confusion, rather than abandoning injunctive relief all together.

As to the sixth factor, delay in suing the infringer, the Court found no delay on the part of CNBEC in bringing its claims. Thus, the Court did not consider this factor important. Because CNBEC did act promptly to protect its rights, we believe that if this factor is to be given any weight, it would favor CNBEC's application for injunction.

The Court considered that the seventh factor, misconduct on the part of CNBEC, weighed heavily against the grant of an injunction. CFG alleges that CNBEC dropped the word "National" in

21

its advertisements following CFG's entrance in the market in order to increase confusion and advance its litigation strategy. The Court concluded that there was evidence in e-mails and memos from CNBEC's marketing team and other employees "that indicated that CNBEC took affirmative actions aimed at increasing confusion to further their own efforts in this case." These efforts, the Court found, all occurred after CFG announced its intention to enter the market. The Court believed this "clear evidence of unclean hands is significant."

Although there is some evidence of at least consideration of a plan by CNBEC to enhance their litigation position, the District Court took a severe view of the evidence and allowed this evidence to overshadow the merits of the plaintiff's claim and the public's interests. See Republic Molding Corp. v. B.W. Photo Utilities, 319 F.2d 347, 350 (9th Cir. 1963) ("Unclean hands, then, does not stand as a defense that may be properly considered independent of the merits of the plaintiff's claim . . . .").

> In the interests of right and justice the courts should not automatically condone the defendant's infractions because the plaintiff is also blameworthy, thereby having two wrongs unremedied and increasing the injury to the public. Rather the court must weigh the substance of the right asserted by the plaintiff against the transgression which, it is contended, serves to foreclose that right.

Id.

In a trademark infringement action, "the court must show solicitude for the public in evaluating an unclean hands defense." Donoghue v. IBC/USA (Publications), Inc., 886 F. Supp. 947, 954 (D. Mass. 1995). Because a central concern in an unfair competition case is protection of the public from confusion, courts require clear, convincing evidence of "egregious" misconduct before invoking the doctrine of unclean hands. Ciba-Geigy Corp. v. Bolar Pharm. Co., Inc., 747 F.2d 844, 855 (3d Cir. 1984). Furthermore, "the extent of actual harm caused by the conduct in question, either to the defendant or to the public interest, is a highly relevant consideration." Republic Molding Corp., 319 F.2d at 349-350.

There is very little evidence in this case that the thoughts or suggestions of CNBEC's advertising agencies or its marketing team were ever implemented or carried into effect. Whether CNBEC executives disapproved or rejected those ideas or suggestions is not clear in this record, but it is clear that any actual implementation of this strategy was minor. The District Court, in its oral opinion, referred to evidence of e-mails from CNBEC's marketing teams and its ad agencies "regarding a change in the ads to make its ads seem more like those of

22

CFG." The Court, however, did not point to any advertisements that CNBEC used to implement these changes.

CFG argues that CNBEC amended its policy of referring to itself in the first instance as "Citizens National Bank," and began using "Citizens" alone more frequently to highlight the similarity with CFG's marks. CFG points to one ad that was run originally in 2000, and again in 2002, where the 2002 version shortened its name in the text of the add from "Citizens National Bank" to "Citizens." CNBEC counters this claim, explaining that its internal communication guidelines from 1995, prior to CFG's entrance, state clearly that the bank will refer to itself as either "Citizens National Bank" or "Citizens" in all communications. Therefore, particularly when CNBEC's ads prominently display the CNBEC logo with "Citizens National Bank" in large print in the layout as a first reference, the bank may refer to itself with either its full or shortened name in the text of an ad and still be within its guidelines.

CFG also argues that CNBEC created a welcome letter for new customers stating "[y]ou may have already noticed that Citizens is not your ordinary bank," in an attempt to create confusion with CFG's tagline of "not your typical bank." However, CNBEC explained that this sentence referred to a marketing phrase "Beyond the Ordinary," which CNBEC had used well before CFG entered the market.

We believe that although there is evidence that CNBEC employees discussed amendments to a limited number of advertisements in order to enhance its litigation position, the evidence does not support "egregious" conduct on the part of CNBEC to create consumer confusion. This evidence may also be explained as CNBEC's attempt to hold its ground by utilizing its "Citizens" mark, rather than conceding the name to CFG. Any effort by CNBEC to assert the name "Citizens," which CNBEC spent many years cultivating as a recognizable trademark, does not automatically require a finding of unclean hands. Furthermore, the speculative evidence presented by CFG does not include any actual instances of consumer confusion based on CNBEC's actions. We do not believe that the isolated documents produced by CFG and relied on by the District Court constitute clear, convincing and unequivocal evidence that would reasonably support a finding of unclean hands. Kearney & Trecker Corp. v. Cincinnati Milacron, Inc., 562 F.2d 365, 371 (6th Cir. 1977). We hold that the District Court's heavy reliance on the doctrine of unclean hands to justify its denial of injunctive relief improperly weighted that evidence to the exclusion of the merits of CNBEC's claim and the public interest, and constituted an abuse of discretion.

The District Court also concluded that the last factor, the practicality of framing and enforcing an injunction, weighs in favor of denying a permanent injunction. It observed that CFG "is a large bank with many branches and

23

consumers spanning a large geographical area over many states" and that injunctive relief "would be difficult, if not impossible to enforce." At the utmost, CNBEC seeks injunctive relief in only four counties. An injunction limited to the area of CNBEC's market penetration would not require enforcement in the rest of Pennsylvania or the United States. The numerous branches and geographical dispersion of the infringer's network does not provide it with a blanket insulating it from action against its infringement. No infringer is immune from challenge because of its size. Neither the principles of equity nor the federal Constitution favor the rights of the powerful over the rights of the weak merely because of size.

Referring to consumer protection as the "foremost purpose of trademark law," the Court again referred to CNBEC's alleged unclean hands as the cause of the consumer confusion. As we stated previously, we see no evidence to support this assertion. The Court was further influenced by its interpretation of 12 U.S.C. § 22 requiring CNBEC to use "National" in its name, plus the jury's finding of no likelihood of confusion between defendant's marks and the "Citizens National Bank" mark. We have already addressed our disagreement with the District Court's interpretation of 12 U.S.C. § 22, and there is no need to repeat it here. Reliance on the jury's finding of an absence of confusion between CFG's marks and the "Citizens National Bank" does not respond to the jury's finding of infringement with respect to CNBEC's

mark in "Citizens" standing alone and the likelihood of confusion between that mark and CFG's. Thus, these factors, even when combined with the Court's reliance on the other factors to which it deferred, is not a sufficient ground to support the Court's denial of injunctive relief.

Accordingly, we conclude that CNBEC is entitled to enjoin CFG from the use of the mark "Citizens" in CNBEC's marketplace. "The law of trademark protects trademark owners in the exclusive use of their marks when use by another would be likely to cause confusion." Interpace Corp. v. Lapp, Inc., 721 F.2d 460, 462 (3d Cir. 1983). Although CNBEC's mark is unregistered, the jury found that CFG had a protected interest in the mark, and that CFG infringed on CNBEC's use creating a likelihood of consumer confusion. The concurrent use of a trademark where a likelihood of confusion exists damages the public interest. Jiffy Lube, 968 F.2d at 379. A finding of infringement or the likelihood of confusion with the concurrent use of the infringed trademark implicitly signifies a loss of expectation and goodwill as well. The infringement amounts to borrowing the senior user's reputation and goodwill, which is an injury in and of itself, even without evidence of actual loss of goodwill. See Opticians Ass'n of Am. v. Indep. Opticians of Am., 920 F.2d 187, 195 (3d Cir. 1990) (citing Ambassador E., Inc. v. Orsatti, Inc., 257 F.2d 79, 82 (3d Cir. 1958)).

When we consider CNBEC's reverse confusion harm in light of the

foregoing, the engagement of the parties in the same line of business, CFG's awareness of the senior's use of the mark, and the jury's verdict, there can be no doubt of a strong likelihood of reverse confusion in this case despite CNBEC's use of the term "National." CFG's ability to promote its mark, in light of its enormous resources and many branches, is significantly greater than CNBEC's. "Without the recognition of reverse confusion, smaller senior users would have little protection against larger, more powerful companies who want to use identical or confusingly similar trademarks." Fisons Horticulture, 30 F.3d at 475. Section 43(a) of the Lanham Act has been interpreted by this and other circuits to protect against such infringements by large entities, and we will uphold that principle here. Id. Accordingly, the District Court's refusal to enjoin CFG's infringement constituted an abuse of discretion, and we will reverse.

The more difficult problem arises in the framing of the injunction. CNBEC asserts that an injunction should embrace all of Allegheny, Armstrong, Beaver and Butler counties. It claims that the District Court's advisory ruling that CNBEC's trademark rights extend only as far as the location of its physical branches is legally erroneous. It argues that in determining injunctive relief under Natural Footwear, Ltd. v. Hart, Schaffner & Marx 760 F.2d 1383, 1398-99 (3d Cir. 1985), the extent should be governed by (1) the senior user's value of the sales, (2) growth trends, (3) market shares, and (4) amount and scope of advertising. Under these factors, CNBEC maintains an injunction should encompass the entire four-county area, including the Pittsburgh metropolitan region. CNBEC asserts that this relief is necessary to protect the public interest and its rights.

CFG, on the contrary, points out that CNBEC's branches are located in and immediately adjacent to Butler County. Almost all of its customer accounts are in Butler and Northern Allegheny counties. Dr. Crane, a Harvard business professor testifying on behalf of CFG as an expert witness, explained that CNBEC's market should be limited to its core locations in Butler and Northern Allegheny Counties because "75% of customers open a checking account within four miles of where they live or work."

Looking at CNBEC's share of market deposits, Dr. Crane found that CNBEC accounts for about 13% of deposits in Butler County, 2% in Armstrong county, less than 1% in Allegheny County, and less than 1% in Beaver County. On cross-examination, Dr. Crane also acknowledged that if an injunction issued against CFG because of the likelihood of confusion caused by the use of its name, federal regulations would not bar CFG from using a different name on its branches in the enjoined territory.

CNBEC had approximately 9,886 accounts in northern Allegheny County as of August 1, 2001. Those accounts represented approximately $50 million in deposits and approximately $90 million in

loans. Don Shoney, CEO and Chief Operating Officer of CNBEC, testified that the branch in Northtowne Square in Northern Allegheny County was CNBEC's southernmost facility. He also testified that the banks consumer market centered around its branches but that a much broader market existed for its business accounts and for its non-traditional products such as life insurance, trust services and brokerages, where there is no need to be linked to a physical location.

Although CNBEC lays claim to a four-county market largely because its advertising in print and broadcast media reaches this area, we do not agree that its market extends this far. This Court stated in Natural Footwear that "the senior user of a common law mark may not be able to obtain relief against the junior user in an area where it has no established trade, and hence no reputation and good will." 760 F.2d at 1394. On the other hand, as we pointed out in Scott Paper Co., 589 F.3d at 1231, the grant of a monopoly to CFG by virtue of the federal registration under the Lanham Act should not be liberally construed. The rights granted to the registered user should not be extended. We believe the District Court correctly found CNBEC's market penetration included Butler County and the Northern part of Allegheny County. We do not at this time express any opinion as to the market penetration in Armstrong and Beaver counties, and we leave that determination for the District Court upon remand. As an appellate court one step removed from the facts of this case,

we are hesitant to enunciate the ultimate contours of the injunction. As we noted above, the District Court identified valid concerns regarding potential confusion among CFG's customers in the region, as well as confusion that may arise from required disclosure of the name "Citizens Bank" for customers using ATMs outside of the region or internet banking. Upon remand, we will instruct the District Court to explore these issues and develop the specific limitations in the injunction that will mitigate these potential sources of confusion.

## V. Cross-Appeal

CFG filed a conditional cross-appeal in the event that this Court should reverse the District Court's injunction. We now address that appeal.

### A.

CFG challenges the District Court's evidentiary ruling allowing testimony from CNBEC tellers regarding their experiences with customers confused between the two banks. CFG claims this testimony was inadmissible hearsay. "To the extent the district court's admission of evidence was based on an interpretation of the Federal Rules of Evidence, our standard of review is plenary. But we review the Court's decision to admit the evidence if premised on a permissible view of the law for an abuse of discretion." United States v. Pelullo, 964 F.2d 193, 199 (3d Cir. 1992).

CFG points to no specific instances of a teller testifying to out-of-court statements asserted for their truth. Even

by CFG's description, the tellers described their personal experiences with customers at the bank, which is not inconsistent with Fed. R. Evid. 801(c). Furthermore, "the plaintiffs' own testimony about the actual behavior of their customers is not hearsay." Calahan v. A.E.V., Inc., 182 F.3d 237, 253 (3d Cir. 1999). In this case, the tellers described what they saw and the action they took with respect to customers who appeared to be confused with respect to CFG and CNBEC. This is not hearsay. Further, Fed. R. Evid. 803(3) allows statements, otherwise excluded as hearsay, to be received to show the declarant's then-existing state of mind. Id. at 251. To the extent that any of the customers' statements may be deemed hearsay, we believe Rule 803(3) would apply. Thus, the District Court did not abuse its discretion by admitting this testimony.

B.

CFG also complains that the District Court erred in its jury instruction concerning the determination of CNBEC's rights in the mark "Citizens" standing alone. CFG asserts that the District Court's instruction did not require a finding that CNBEC had consistently used "Citizens" as a trademark over time prior to CFG's entry in the market. The legal accuracy of jury instructions are reviewed de novo. See United States v. Khorozian, 333 F.3d 498, 507-08 (3d Cir. 2003).

CFG argues that the undisputed evidence shows that CNBEC started using the mark standing alone consistently only after CFG entered the market. CFG argues that had the instruction required a temporal finding, the jury would not have found that CNBEC obtained trademark rights in "Citizens."

CFG's argument relies upon a single passage from the instructions that does not include a temporal instruction regarding CNBEC's use of "Citizens." However, the scope of review for a jury instruction is whether, when taken as a whole, they properly apprise the jury of the issues and the applicable law. Khorozian, 333 F.3d at 508 (explaining that courts review "the totality of the instructions and not a particular sentence or paragraph in isolation."); Everett v. Beard, 290 F.3d 500, 512 (3d Cir. 2002); Tigg Corp. v. Dow Corning Corp., 962 F.2d 1123 (3d Cir. 1992).

Upon review of the instructions, it is clear that the District Court instructed the jury specifically that in order to be a senior user of a mark, CNBEC's rights should be evaluated prior to CFG's entry into the disputed market area in July, 2001. In describing secondary meaning, the Court explained that the jury must consider consumer perception of the mark "prior to CFG's entry." This Court presumes that the jury followed the Court's instructions. United States v. Givan, 320 F.3d 452, 462 (3d Cir. 2003), United States v. Syme, 276 F.2d 131, 155 (3d Cir. 2002). Thus, we presume that the jury considered CNBEC's use of "Citizens" prior to CFG's entrance to the market in determining that CNBEC had a protected interest in the trademark.

The District Court's evidentiary ruling and the challenged jury instruction raised in CFG's cross-appeal will be affirmed.

## VI. Conclusion

In accordance with the foregoing, the evidentiary rulings and jury instructions of the District Court during the jury trial and the order denying the motion for a new trial are affirmed. However, the judgment of the District Court entered in favor of Citizens Financial Group's (CFG's) complaint for a declaratory judgment will be vacated. The case will be remanded to the District Court to mold the verdict to reflect that Citizens National Bank of Evans City (CNBEC) has not proven that it has suffered money damages as a proximate result of CFG's infringement, but also with directions to enter judgment in favor of CNBEC on the declaratory judgment claim, stating that CFG is not entitled to a declaratory judgment allowing its use of "Citizens" in CNBEC's market area.

The District Court's denial of CNBEC's motion for injunctive relief, and the subsequent injunction issued against CNBEC requiring its use of the term "National" as part of its name when it first refers to itself in any document or advertising, will be vacated. On remand to the District Court, it is directed to enter an order permanently enjoining CFG from offering or advertising retail banking services under the mark "Citizens Bank" in Butler County and to conduct an evidentiary hearing to determine the specific contours of CNBEC's market area in the other three disputed counties.

The District Court is directed to strike from its opinion its statement that "future actions by CNBEC based upon additional evidence of consumer confusion occurring after November 1, 2002, would be frivolous and unwarranted."

Sixty percent of the costs will be taxed against CFG.